1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290

*and*

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

*Attorneys for Plaintiffs Sharmilli Ghosh, Irland James Stewart, and Howard Weisman*

*[Additional Counsel on Signature Block]*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| SHARMILLI GHOSH, IRLAND JAMES STEWART, and HOWARD WEISMAN, *Individually and on behalf of all other similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> SNAP INC., EVAN SPIEGEL, ROBERT MURPHY, ANDREW VOLLERO, IMRAN KHAN, <br><br> Defendants. | Case No.: 18-cv-9587 _____ <br><br> **CLASS ACTION** <br><br> **CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** <br><br> Judge: _____ |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   JURISDICTION AND VENUE ....................................................... 7

III.  PARTIES TO PLAINTIFF'S CLAIMS UNDER THE EXCHANGE ACT ............ 8

     A.    Plaintiffs ............................................................................. 8

     B.    Exchange Act Defendants .................................................. 8

          1.    Snap Inc. ................................................................... 8

          2.    Executive Defendants .............................................. 8

IV.  RELEVANT NON-PARTIES TO PLAINTIFF'S CLAIMS ............... 10

V.   VIOLATIONS OF THE EXCHANGE ACT ..................................... 11

     A.    Snap's Journey from Novelty to Multi-Billion Dollar IPO ......... 11

          1.    Venture Capital Firms Bankroll Snap's Rise to Prominence ............. 11

          2.    The Importance of User Engagement Metrics .................................. 13

          3.    Snap's Culture of Secrecy .................................... 14

          4.    Snap's Rapid Growth is Marred by Allegations of Unreliable User Metrics ............................................................. 16

          5.    Facebook Releases A Competing Product Six Months Before the IPO Which Undisclosed to Snap's Investors, Has an Immediate and Dramatic Impact on Snap's Growth ......................... 19

          6.    Faced with Declining User Growth and Engagement, Snap Rushes to Go Public ............................................................. 23

     B.    Snap's IPO ............................................................................. 24

          1.    The Registration Statement Falsely Touts Snapchat's Rapid Growth and Conceals the Known Impact Instagram's Stories had on Snap's User Growth and Engagement ......................... 25

          2.    The Registration Statement Conceals Credible Allegations that Snap's User Metrics were Unreliable ............................... 29

          3.    Snap's Roadshow: The Underwriters Help Cement the Company's False News Growth Narrative ........................... 32

          4.    As Snap Goes Public, Defendants and Other Insiders Cash Out, and the Underwriters Reap Hefty Commissions ......................... 33

5.  The Underwriter Banks Initiate Coverage with Price Targets Well Above the IPO Price ................................................................ 34

VI. THE TRUTH IS GRADUALLY REVEALED ......................................................... 36

A.  Pompliano Blows the Whistle on Snap's Allegedly Unreliable User Engagement Metrics ........................................................................ 36

B.  Snap Denies All of Pompliano's Allegations Prior to the IPO .................... 41

C.  After the IPO, New Details About Pompliano's Allegations Emerge .......... 42

D.  1Q 2017 Results .......................................................................... 44

E.  The Exchange Act Defendants Attempt to Prop Up Snap's Declining Stock Price With Additional False and Misleading Statements ................. 46

F.  Third-Party Data Suggests that the Exchange Act Defendants' False Assurances are Untrue ................................................................... 49

G.  Morgan Stanley Downgrades Snap's Stock ........................................ 49

H.  2Q 2017 Results .......................................................................... 50

I.  Post-Class Period Developments ..................................................... 53

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 54

VIII. EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ...... 58

A.  Snap's Registration Statement ....................................................... 58

1.  The Registration Statement Contained Materially False and Misleading Statements Regarding Snap's User Growth and Engagement .................................................................... 58

2.  The Registration Statement Contained Materially False and Misleading Statements about Snap's Restatement of its DAU Numbers and the Risk of Inaccurate User Metrics ...................... 62

3.  The Registration Statement Failed to Disclose Pompliano's Allegations that Snap's User Metrics were Unreliable, a Material Omission and Violation of ASC 450 .................................. 64

B.  May 10, 2017 Conference Call ....................................................... 66

C.  May 24, 2017 J.P.Morgan Conference ............................................. 68

IX.  LOSS CAUSATION ................................................................................. 69

X.  PRESUMPTION OF RELIANCE ............................................................... 76

XI.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ...................................................... 78

XII.  CAUSES OF ACTION UNDER THE EXCHANGE ACT .................................. 79

    A.  COUNT I: For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against the Exchange Act Defendants ...................................... 79

    B.  COUNT II: For Violation of §20(a) of the Exchange Act Against the Executive Defendants ................................................................... 79

XIII.  VIOLATIONS OF THE SECURITIES ACT ...................................................... 80

    1.  The  Defendants .............................................................................. 81

    C.  Factual Background ........................................................................ 81

        1.  Snap's IPO ........................................................................... 81

        2.  The Securities Act Defendants Rushed to Bring Snap to Market In the Face of Rapidly Growing Competition from Facebook .......... 82

        3.  The Securities Act Defendants Conceal Pompliano's Credible Allegation that Snap User Metrics were Unreliable ........................ 83

        4.  The Underwriters Reap Enormous Profits in Snap's IPO ................ 84

        5.  As Information Concealed in the Registration Statement Is Gradually Disclosed, the True Value of Snap Common Stock Is Revealed ................................................................................. 84

    D.  The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act ............................................................................... 86

        1.  Failure to Disclose the Impact of Instagram "Stories" on Snap's DAU ................................................................................... 86

    E.  The Registration Statement Failed to Disclose Information Required to be Disclosed under SEC Regulations ................................................ 93

        1.  Item 503 ............................................................................... 93

        2.  Item 303 ............................................................................... 94

        3.  ASC 450 ............................................................................... 96

XIV.  CAUSES OF ACTION UNDER THE SECURITIES ACT .................................. 97

    A.  COUNT III: For Violation of §11 of the Securities Act Against the Securities Act Defendants ............................................................... 97

    B.  COUNT IV: For Violation of §15 of the Securities Act Against the Executive Defendants ................................................................... 98

XV.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ............... 99

XVI.  PRAYER FOR RELIEF .......................................................................... 100

XVII. JURY DEMAND .................................................................................. 101

Plaintiffs Sharmilli Ghosh, Irland James Stewart, and Howard Weisman (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the ongoing independent investigation of their counsel, Levi & Korsinsky, LLP and Pomerantz LLP. This investigation includes, among other things, a review and analysis of: (i) public filings by Snap Inc. ("Snap" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of investor calls and conferences with Snap senior management; (vi) interviews with former Snap employees; and (vii) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing and many of the facts supporting Plaintiffs' allegations are known only to Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.   This action arises from social media giant Snap's initial public offering ("IPO") on March 2, 2017. The registration statement and prospectus incorporated therein, issued in connection with the IPO (collectively, the "Registration Statement") presented Snap as having a fast-growing and highly engaged user base primed for increasing monetization through advertising revenue.

2.   The IPO was underwritten by some of Wall Street's most prominent and largest investment banks, including Morgan Stanley and Goldman Sachs, who served as co-leads. In an unprecedented move, fueled by Snap's demands for secrecy, other members of the underwriting syndicate, a who's-who of Wall Street banks, including J.P.Morgan, Deutsche Bank, Barclays Capital, Credit Suisse and Allen & Company,

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

dispensed with even receiving a draft of the Registration Statement until *after* it was published. Road show presentations which began on February 17, 2017 amplified Snap's representations about its user growth and engagement, and the reliability of its user metrics.

3.   The IPO raised $3.4 billion from public investors, $544 million of which went directly to the pockets of Snap's founders, Defendants Evan Spiegel and Robert Murphy. Another $200 million went to other insiders who sold their shares in the offering. The syndicate of underwriters, led by Morgan Stanley and Goldman Sachs, collectively made approximately $85 million in fees, and millions more from sales of shares held back in the offering.

4.   Following the IPO, Snap's stock price soared to a Class Period high of $29.44 on the day after the IPO. As analysts initiated coverage of Snap's fledgling stock, the investment banks who underwrote the IPO issued price targets well above the IPO price. Morgan Stanley initiated coverage of Snap on March 28, 2017 at "overweight"— industry jargon for a recommendation to "buy"—with a one year price target of $28. For a time, based on the Defendants' market representations, it seemed Snap was on track to become the next social media giant.

5.   However, investors were in for a rude awakening, as it soon became clear that the Registration Statement, along with statements made by Snap's management after the IPO, concealed material information concerning Snap's actual risks. Many of Snap's core representations in the Registration Statement would be revealed to be materially misleading.

6.   At its core, the Registration Statement made numerous statements concerning Snap's continuing growth and user engagement as this was the central growth and value premise that Snap and its underwriters were touting to the market. Numerous graphs depicted continuous quarter-over-quarter growth through the end of 2016. Although Snap's user growth in the fourth quarter of 2016 had been "relatively flat" according to the Registration Statement, this was to be expected as Snap's user growth

was "lumpy," and had to viewed in context with "the accelerated growth in user engagement earlier in the year."  Snap omitted user data metrics for the two months preceding the IPO.

7.     In fact, the reality of Snap's user metrics, as was abundantly clear to Snap's management before the IPO, was that Snap's principal competitor Facebook had successfully mimicked Snapchat's most popular features through its own Instagram "Stories" function and, by the time of the IPO, had eclipsed Snap's Daily Active Users ("DAU"), the principal metric on which Snap touted as fundamental to its valuation.

8.     Facebook's Instagram Stories function represented an existential threat to Snap and prior to the IPO, as former employees interviewed disclosed, there was widespread concern expressed by Snap's sales force to senior management that advertisers were skeptical of Snap's continued value proposition given Instagram's growth.  Indeed, by the time of Snap's IPO, even though Instagram's Stories had been launched barely six months earlier, it had eclipsed Snap's user base and was on a trajectory to vastly outnumber Snap's users within months.  Competition from Facebook was the focus of a company-wide meeting held in January 2017 wherein an extensive Q&A session, Snap's senior management fielded numerous questions from Snap's beleaguered sales team about Instagram's competition.  The extremely adverse and highly negative trend to Snap's user growth and engagement caused by Instagram was not disclosed in the Registration Statement and this omission rendered the Company's statements about user growth and engagement and the potential impact of competition from other products materially false and misleading.

9.     As would be revealed shortly after the IPO, Facebook was eviscerating Snap's user growth and Snap's growth had effectively stalled.  This revelation would come only after another bombshell involving a Snap whistleblower.

10.     On April 4, 2017, it was reported that a former Snapchat employee and whistleblower, Anthony Pompliano, had moved to unseal a previously filed complaint against the Company.  The report revealed that according to newly-released details about

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

the complaint, the whistleblower alleged that Snapchat had misrepresented details about the popularity of its application to investors in the IPO. In response to this news, Snap's share price fell approximately 7.3%.

11.   Pompliano had been recruited from Facebook in September 2015 to help lead Snap's user growth.  Upon joining the Company, he immediately set about evaluating Snap's user metrics and their reporting and, according to the allegations in his complaint, found egregious deficiencies in the controls over Snap's reporting of user metrics.  His analysis revealed that Snap's 2015 metrics were overstated and he brought this to senior management's attention.  He was then, reportedly, swiftly terminated and after his departure, Snap's senior management began to discredit him in the industry. Pompliano filed a lawsuit against Snap in January 2017 in California state court which was heavily redacted and largely under seal.  Although the lawsuit was reported in the press, Snap emphatically dismissed the lawsuit as that of "a disgruntled employee fired for poor performance" and whose claims "were without merit."

12.   An investor reviewing the Registration Statement would never have known the existence of the Pompliano suit as it was not disclosed in the section of the Registration Statement described "Pending Matters" even though that section enumerated lawsuits against Snap that had been dismissed and were no longer pending. And an investor trying to understand Snap's risk disclosures, including the disclosure that "*real or perceived inaccuracies* in [Snap's user] metrics may seriously harm and negatively affect our reputation and our business," could never have understood that risk to have already manifested in a filed whistleblower complaint by Pompliano which both challenged the reliability of Snap's reported metrics but also claimed credit for requiring the restatement of Snap's 2015 user metrics.

13.   Although silent about the Pompliano lawsuit, the Registration Statement disclosed that it had restated Snap's 2015 user growth data.  As it would be later revealed, once Pompliano's lawsuit was unsealed after the IPO in April 2017, the need to restate the 2015 metrics was among the numerous deficiencies that Pompliano had brought to

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

Snap's attention.  The revelation that Pompliano's allegations were grounded in fact, and not just the allegations of a former disgruntled employee, shocked investors.  As one market commentator noted, "for investors, though, whether or not Snap exaggerated the user number matters less at this point than the fact that Pompliano's lower number turned out to be right."

14.     Following on the heels of this revelation, the true impact of Instagram on Snap's growth began to be revealed to investors.  On May 10, 2017, Snap reported its first quarterly results as a public company, disclosing only modest growth in the key performance metric, DAU, which it had touted as being vital to its success in its Registration Statement.  In response to this news, Snap's stock dropped approximately 21% in a single day.  Market commentators uniformly attributed Snap's slowing user growth to direct competition from Instagram.  As one commentator wrote, "Compared to early 2016, this growth rate sucks, and the change correlates with the rise of Instagram Stories."

15.     Despite its disappointing first quarter, as the truth about Instagram's true impact on Snap was being revealed and Pompliano's allegations had become public, Defendants sought to reassure investors about Snap's prospects by emphasizing the quality of Snap's user engagement despite the quantity of those users being severely impacted by Instagram.  In doing so, Defendant Spiegel and Defendant Khan specifically claimed that Snap's user engagement was more organic than its competitors because it did not employ "growth hacking"—efforts to artificially boost user engagement metrics by driving traffic to the application through excessive user notifications—to drive user growth.

16.     The powerful Wall Street banks that had helped take Snap public similarly reiterated their rosy assessments for the Company's future growth, muting the voices of those who noted that without the rapid growth in user engagement promised in the Registration Statement, Snap's ability to monetize its platform and achieve profitability was impossible.  Indeed, Morgan Stanley continued to rate Snap as "overweight" with a

$28 price target.

17.     Based on the Company's false assurances, Snap's stock continued to trade above the offering price.  However, the truth about Snap began to be revealed on June 7, 2017, when it was reported that based on data from SensorTower, a firm that tracks app analytics, worldwide downloads of Snapchat for the months of April and May 2017 were down 22% from the year prior, confirming that the image of Snap as a rapidly-growing, soon-to-be profitable business presented in the Registration Statement was just a mirage. On this news, Snap's share price fell approximately 7.4%.

18.     Based in part on this new, independent data calling into question Snap's prior representations to the market, on July 11, 2017, in a stunning announcement, Morgan Stanley, the lead underwriter for Snap's IPO abruptly downgraded the stock and lowered its price target from $28 to $16, below the offering price.  In support of this sudden reversal, Morgan Stanley cited in part the recent data showing slowing growth in new downloads of Snapchat.  On this news, Snap's share price fell an additional 8.9%.

19.     By the time Snap announced its second quarter results on August 10, 2017, Snap's stock was trading at only $13.77.  When the Company announced that yet again, growth in key user engagement metrics had been stagnant, it was clear that the trend that had been concealed by Snap in the Registration Statement—Facebook's eclipsing Snap's DAU and snapping up its advertisers—had fully materialized.  Snap was not going to be the social media powerhouse investors had been led to believe it would be.  Moreover, in a complete reversal of Snap's claim that its user engagement metrics reflected organic growth, an analyst on the earnings call queried whether Snap was "growth hacking" notwithstanding Defendant Spiegel and Defendant Kahn's explicit statements that Snap did not engage in such practices.  This time, in an about face, Spiegel confessed that push notifications, i.e. growth hacking "it's important for our business."

20.     Snap's share price fell an additional 14% on this news.  This time, however, analysts got the message, with one analyst noting that it was "skeptical of Snap's longevity, as the company lacks meaningful innovation in the face of significant

competitive pressure."

21.  As it now has become clear, Snap's IPO was a race to capitalize on the market's misconception that Snap was a viable and growing company before the truth about the actual threat Instagram posed became known.  The only winners were the insiders who personally sold tens of millions of shares to unsuspecting investors and the underwriters who reaped immense fees.

22.  As set forth in more detail herein, Plaintiffs bring this securities class action on behalf of Plaintiffs and all purchasers of Snap common stock between March 2, 2017 and August 10, 2017, inclusive (the "Class Period"), including those who purchased Snap common stock traceable to the registration statement and prospectus incorporated therein, issued in connection with the Company's March 3, 2017 IPO Registration Statement.  This action asserts violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder.

## II.  JURISDICTION AND VENUE

23.  The claims asserted herein arise under §11 and §15 of the 1933 Act (15 U.S.C. §77k and §77o) and §10(b) and §20(a) of the Exchange Act (15 U.S.C. §78j (b) and §78t (a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

24.  Jurisdiction is conferred by 28 U.S.C. §1331 and §22 of the Securities Act and §27 of the Exchange Act.

25.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the Securities Act as certain of the Defendants reside, are headquartered, and/or maintain operations, in this District.  Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District.

26.  In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES TO PLAINTIFF'S CLAIMS UNDER THE EXCHANGE ACT

### A.   Plaintiffs

27.   Plaintiff Sharmilli Ghosh is an individual investor who purchased Snap common stock pursuant and/or traceable to the March 2, 2017 IPO as described in the certification attached hereto, and was damaged thereby.

28.   Plaintiff Howard Weisman is an individual investor who purchased Snap common stock pursuant and/or traceable to the March 2, 2017 IPO as described in the certification attached hereto, and was damaged thereby.

29.   Plaintiff Irland James Stewart is an individual investor who purchased Snap common stock pursuant and/or traceable to the March 2, 2017 IPO as described in the certification attached hereto, and was damaged thereby.

### B.   Exchange Act Defendants

#### 1.   Snap Inc.

30.   Snap, a Delaware corporation headquartered in Venice, California, is a self-described "camera company" whose primary product is a free mobile chatting application, Snapchat.  Snap, trades on the New York Stock Exchange ("NYSE") as "SNAP," generates revenue by growing user engagement of Snapchat and delivering advertisements to Snapchat users.  In 2012, the parent company of Snapchat incorporated as Snapchat, Inc.  In 2016, Snapchat, Inc. changed its name to Snap, Inc.

#### 2.   Executive Defendants

31.   Defendant Evan Spiegel ("Spiegel") is one of the co-founders of Snap and has been a director and the Company's CEO since its founding.  Spiegel signed the false and misleading Registration Statement, and throughout the Class Period, made statements in Company releases, conference calls, and other public forums as alleged herein.

32.   Defendant Robert Murphy ("Murphy") is one of the founders of Snap and

has been a director and the Company's Chief Technology Officer since its founding. Murphy signed the false and misleading Registration Statement and throughout the Class Period, made statements in Company releases, conference calls, and other public forums as alleged herein.

33.     Defendant Andrew Vollero ("Vollero") has been Snap's Chief Financial Officer since 2016.  Vollero signed the false and misleading Registration Statement and throughout the Class Period, made statements in Company releases, conference calls, and other public forums as alleged herein.

34.     Defendant Imran Khan ("Khan") has been Snap's Chief Strategy Officer since January 2015.  Prior to joining Snap, Khan was head of global internet and US entertainment equity research at JP Morgan and then joined Credit Suisse as an investment banker.  Throughout the Class Period, Khan made statements in Company releases, conference calls, and other public forums as alleged herein.

35.     The Defendants referenced above in ¶¶ 31-34 are collectively referred to herein as the "Executive Defendants."

36.     The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of the Company and had the power and authority to control the contents of Snap's reports to the SEC, press releases, and presentations to securities analysts and investors.  Moreover, Defendants Spiegel and Murphy held the most powerful leadership roles within the Company (as CEO and then CTO, respectively), throughout the entire duration of the fraud; indeed, both Spiegel and Murphy had occupied central roles within the Company since they co-founded Snapchat in 2011.  All of the Executive Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and disseminating the false and misleading statements and information alleged in this Complaint.

37.     Together with Snap, the Executive Defendants are collectively referred to as the "Exchange Act Defendants."

## IV.    RELEVANT NON-PARTIES TO PLAINTIFF'S CLAIMS

38.    Anthony Pompliano ("Pompliano") is a former Snap employee and whistleblower who alleges that Snap misrepresented its user engagement metrics to investors, the public, and advertisers.  In a retaliatory discharge and whistleblower case filed in California state and federal courts, he has alleged that Snap lacked a functioning system of internal controls over user engagement data, that it relied on user engagement data it knew to be inaccurate, and suppressed evidence calling into question the integrity of its data.  Pompliano is a decorated Iraqi war veteran and a leading expert in the specialized field of developing and testing growth strategies for social media internet companies.  Pompliano was specifically recruited by Snap from Facebook, as part of its effort to attract talented individuals who could help increase user engagement.  Prior to joining Snap in September 2015, Pompliano co-founded two successful start-up companies, including a leading social intelligence company specializing in demographic and psychometric measurement.  In February 2014, Pompliano was recruited to join Facebook, where he led the Growth & Engagement initiatives for one of Facebook's major business units, its "Pages" division, which is the modern day social-media equivalent of the yellow pages.

39.    Former Employee 1 ("FE 1") is a former Regional Director of Sales and Marketing who worked at Snap between mid-2015 and early-2017.  FE 1 supervised a team of approximately twelve employees whose job it was to pitch Snapchat to major advertisers in order to sell ad space.  FE 1 revealed that, from the second and third quarters of 2016 until the time FE 1 left Snap in the first quarter of 2017, there was an ongoing concern within Snap regarding Instagram and its effect on Snap's ability to compete for advertisers.  FE 1 revealed that after Instagram launched its Stories function, concerns about Instagram and Snap's ability to compete came up in the sales team's conversations with advertisers.  FE 1 revealed that these concerns were expressed to Snap's executive management, who responded in the form of an internal Company memo which FE 1 explained attempted to summarily minimize the risk of competition by

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

claiming that Facebook has always been Snap's competitor and Snap had survived thus far.

40.     Former Employee 2 ("FE 2") is a former salesperson in Brand Partnerships at Snapchat.  FE 2 worked in a regional office of approximately 10 employees between January and June 2017.  FE 2 revealed that Snap held a company-wide meeting in January 2017 during which numerous employees expressed concerns to Spiegel and other senior executives about competition from Facebook and the impact it was having on Snap's user growth and engagement and the ability to monetize its platform.  According to FE 2, Spiegel dismissed such concerns.  However, throughout FE 2's employment at Snap, advertisers expressed consistent concerns about Snap's ability to compete with Facebook, and specifically with Instagram's replication of popular Snapchat features including Stories.  In the face of such concerns, FE 2 revealed that Snap's internal sales projections and assumptions regarding the Company's ability to grow and monetize its platform were not realistic.

## V.     VIOLATIONS OF THE EXCHANGE ACT

### A.     Snap's Journey from Novelty to Multi-Billion Dollar IPO

#### 1.     Venture Capital Firms Bankroll Snap's Rise to Prominence

41.     Snap began in 2011 as a picture messaging application for the iPhone called "Snapchat."  Snapchat's primary innovation over other messaging applications was that it enabled users to send disappearing messages or "Snaps" that were visible for only ten seconds.  This "ephemerality" made Snapchat unique in the minds of its users and led to widespread adoption among younger demographics.

42.     As Snapchat grew in popularity, Snap added additional features to the application, such as video messaging, and expanded its reach to other mobile operating systems, including Android.  By 2013, Snap boasted of having 1 million DAU on its application.

43.     Snapchat's dramatic early growth was funded by investments from venture capital firms seeking to reap astronomical returns on the next social media startup.  In

2012 and 2013, Snap raised over $162 million in five rounds of fundraising.

44.    Fueled in part by this new capital, Snap continued to add additional features to Snapchat throughout 2013 and 2014 in an effort to attract new users and boost engagement among users, including a "Stories" function that enabled users to tell narratives using different snaps, a "Chat" function enabling users to exchange text and video messages, and "Geofilters," allowing users to enhance snaps with location-specific artwork.

45.    By July 2015, Snap reportedly had 100 million DAU on Snapchat. Snapchat's rapid growth coincided with an effort by Snap to monetize Snapchat's popularity through the introduction of paid advertisements, including "Brand Stories" whereby advertisers created promotional snaps for display on the application.

46.    In an effort to further grow its user base and increase revenues, Snap added new features to Snapchat throughout 2015 and 2016, including augmented-reality "lenses," which are interactive animations overlaid on a person's face or background enabling the creation of whimsical self-portraits, as well as voice and video calling and group chat functions.   The addition of these new features propelled Snap's rising popularity.   In the months leading up to its IPO, Snap reportedly had 150 million DAU on Snapchat.

47.    However, the additional functionality Snap added to Snapchat did not come cheaply.   In 2014, Snap raised $485 million in a single round of fundraising. Snap raised an additional $200 million in funding in 2015, followed by a whopping $1.8 billion in 2016.

48.    Snap's strategy of luring new investors with the promise of exponential returns once the Company went public was successful for a time.   In total, Snap raised approximately $2.6 billion in funding from venture capital firms in the years leading up to its IPO.

49.    While these heavy investments appeared to be paying off, as Snap's user base grew and as its platform and products became more sophisticated, so did its

operating costs.  As reported in the Registration Statement, Snap's net losses in the two years preceding its IPO increased from $372.9 million in 2015 to $514.6 million in 2016. Furthermore, as of December 31, 2016, Snap had an accumulated deficit of $1.2 billion.

50.     Snap's consistent stream of venture capital allowed the Company to paper over these losses and continually roll out new product innovations in order to attract and retain users.  However, by 2016, the Company was desperately in need of new sources of capital.

### 2.     The Importance of User Engagement Metrics

51.     For a social media startup like Snap, maintaining and growing the popularity of its application is essential.  Without consistent user engagement, an application like Snapchat is little more than a novelty.  With it, Snapchat provides a platform for advertisers to reach a coveted demographic: young, affluent consumers.

52.     As Snap stated in the Registration Statement: "We assess the health of our business by measuring Daily Active Users because we believe that this metric is the most reliable way to understand engagement on our platform."  Snap added that "Daily user engagement with our products is a critical component to our business because it influences our advertising inventory as well as our expenses."

53.     In order to effectively monetize its user engagement, Snapchat must be able to demonstrate the popularity of its product.  Snap's main source of revenue is advertising.  In the "Risk Factors" of the Registration Statement, Snap stated that "Substantially all of our revenue is generated from third parties advertising on Snapchat, a trend that we expect to continue.  For the years ended December 31, 2015 and 2016, advertising revenue accounted for 98% and 96% of total revenue, respectively."

54.     Advertising revenue is driven by the total number of users on the platform and, even more importantly, the level of engagement of such users.  Thus, the more often users are on the platform to view advertisements (the more engaged users are), the higher Snap's advertising revenues.

55.     As Snap stated in the Registration Statement:

> Our strategy is to invest in product innovation and take risks to improve our camera platform. We do this in an effort to drive user engagement, which we can then monetize through advertising. We use the revenue we generate to fund future product innovation to grow our business.

56. DAU is widely viewed as one of the most important (if not the most important) key performance indicator in the social media industry. It is used, among other things, to measure an application's growth, rate of user retention, depth of user engagement, and to help create strategies for improving such core metrics, which is critical to success. Given the importance of an application's DAU and other user engagement metrics, it is standard industry practice to employ sophisticated data analytics methods and testing to ensure the validity of these metrics and to develop intelligent strategic growth and user engagement initiatives based on analyses of the numbers.

57. As Snap shifted its focus from attracting venture capital to marketing itself to the broader investing public, the need to demonstrate its growing user engagement became paramount. Snap emphasized this fact in the Registration Statement, stating that "Our user metrics and other estimates are subject to inherent challenges in measurement, and *real or perceived inaccuracies* in those metrics may seriously harm and negatively affect our reputation and our business."[1]

58. As a result, accurate information about the number of users and user engagement was essential for potential investors in Snap to understand the Company's ability to grow its revenues. However, the transparency and disclosure that came along with becoming a public company contrasted sharply with Snap's culture of secrecy and siloed business structure it had built around Spiegel.

### 3. Snap's Culture of Secrecy

59. In contrast to many tech startups, Snap has historically been a secretive Company. As reflected in news reports, Company insiders describe Snap as having "a

---

[1] Unless otherwise indicated, all emphasis is added.

culture of extreme secrecy" driven by Spiegel, who "reportedly communicates with his executives via disappearing Snap messages." Maya Kosoff, "Why is Snapchat Being So Secretive About Its I.P.O." *Vanity Fair* (Jan. 17, 2017). Employees described the Company as "siloed," noting that "Snap doesn't hold the all-hands meetings typical of other Silicon Valley companies to explain strategy and keep everyone abreast of news at the company." *Id*.

60. As recounted in one article, "Because of how he has structured the organization into siloed groups that rarely interact with each other, only Spiegel, his most senior executives, and a handful of close confidants have more than a small picture of the company's future roadmap." Alex Heath, "The Cult of Evan: What life is like inside Snap right now," *Business Insider* (Aug. 1, 2017). The profile of Spiegel described Snap as "an Evan Spiegel project" based on his "centralized, unfettered control," which fostered a "secretive, contrarian culture that has come to define the company."

61. Another article summed it up: "That's the way things work at Snap, an ultra-secretive organization where employees are unlikely to know the goals or strategy of other teams. The only person who knows the full picture of the company's next steps is Spiegel, whose prickly opinions about privacy have propelled Snap's trajectory." Sarah Frier and Alex Barinka, "Can Snapchat's Culture of Secrecy Survive an IPO?" *Bloomberg* (Jan. 17, 2017). These accounts are corroborated by many other profiles of Snap and its leader. As *Business Insider* noted, rather than being governed by established protocols, "The power and respect you possess within Snap is largely determined by one factor: How close you can get to the sun. And the sun is Evan Spiegel." Alex Heath, "The Cult of Evan: What life is like inside Snap right now," *Business Insider* (Aug. 1, 2017).

62. In an October 8, 2016 profile of the Company based on "more than a dozen current and former employees," *Business Insider* reported:

> At Snapchat, which recently renamed itself SnapInc., secrecy and upheaval come with the job. Evan Spiegel, the 26-year-old cofounder and CEO, moves across the company's network of Venice Beach outposts in a black Range Rover, flanked by his security detail. New employee orientations begin with

a Fight Club-like list of forbidden topics of discussion. And internal projects blossom out of nowhere—and vanish suddenly—without explanation.

63.     The report quoted a former Snap executive as stating that "Nothing happens there without Evan [Spiegel]'s stamp of approval."

64.     In keeping with Snap's culture of secrecy built around Spiegel, Snap jealously guarded all details about its intended IPO.  As one report detailed in January 2017, after details of Snap's IPO leaked, including its reported $25 billion valuation, "the social-media giant [] enforced a virtual lockdown on company information."

65.     As confirmed by FE 2, Snap's culture of secrecy extended to its user engagement data.  FE 2 confirmed that Snapchat user information such as rates of downloads was locked away in one unit and that that Snapchat was secretive about such information.  According to FE 2, Snap's sales employees were not provided evidence of any third party verification of the information.  The only metrics available to Snap's sales teams was that which was given to them periodically for sales purposes.  This general data was accessible through an internal system.  There were two types of data.  One set was available to be distributed to those who had not signed a non-disclosure agreement ("NDA"), and additional higher level data for those who had signed a NDA.  The types of data Snap made available to sales personnel included DAU and information about user ages and locations.

### 4.     Snap's Rapid Growth Is Marred by Allegations of Unreliable User Metrics

66.     Snap's IPO, and the valuation ascribed to it, was predicated on the user engagement and growth data published for the first time by Snap in the Registration Statement.  This is precisely the data that was exclusively within the close circle of confidantes and insiders controlled by Spiegel.

67.     Pompliano is one of very few people who was allowed into the circle of people that had insight into Snap's user metrics.

68.     As Pompliano would later allege, in September 2015, a mere 17 months

before Snap filed for its IPO, Snap lacked a reliable system for measuring its critical user engagement metrics, leading to overstated metrics. For example, while it is standard industry practice to employ user growth and engagement teams to test key user engagement metrics, Pompliano alleges that Snap failed to do so.

69. After being hired by Snap to develop and grow Snap's user base and user engagement, Pompliano alleges that he discovered within Snap an institutional aversion to properly analyzing user engagement data. Pompliano's analysis of Snap's user metrics, which he conducted upon his arrival at Snap in September 2015, revealed that among other things, the third party platforms Snap used to measure DAU were known to be inaccurate, and had been so historically. Despite these known inaccuracies, Pompliano alleges that Snap overstated its DAU by relying on a DAU measurement obtained from a third party provider which was known to produce inflated DAU numbers. Pompliano alleges that when he brought his specific findings regarding the inflation of Snap's user metrics among other concerns to Snap's senior management, including Spiegel, he was fired and retaliated against in response. This prompted Pompliano to commence a lawsuit against Snap two months prior to the IPO, which was largely filed under seal.

70. Pompliano's lawsuit was not identified or described in the Registration Statement. Instead, in the Registration Statement, Snap disclosed that it had changed the provider for its user engagement data, disclosing that "In the past [the Company] relied on third-party analytics providers to calculate [its] metrics." The Registration Statement explained that "before June 2015, we used a third party that counted a Daily Active User when the application was opened or a notification was received via the application on any device." According to Snap, this measurement method inflated DAU numbers by 4.8%, necessitating a reduction in pre-June 2015 DAU numbers. However, nowhere in the Registration Statement did Snap disclose that this reduction in its user metrics was one of a number of issues that Pompliano had brought to the Company's attention, that Snap had fired Pompliano and Pompliano had brought suit against the Company for

retaliation.  The detailed facts alleged by Pompliano were filed under seal in January 2017 and would remain under seal until April 2017, after the IPO.

71.     As Pompliano's original suit alleged, the historical inaccuracy of Snap's user engagement data was not limited to DAU, and extended beyond the 4.8% inflation of DAU numbers disclosed in the Registration Statement.  For example, Pompliano alleged that Snap was also misrepresenting the rate of DAU growth in the 4th quarter of 2015.  Rather than experiencing double-digit month-over-month DAU growth as Snap claimed, Pompliano alleged that his investigation revealed that Snap's DAU growth rate actually ranged from 1% to 4% per quarter.  Furthermore. Pompliano alleged that Snap had falsely represented to advertisers, investors, and others that it had achieved 100 million DAU on Snapchat when, at the time, it had yet to achieve this important user growth milestone.

72.     Moreover, Pompliano alleged that his investigation into Snap's historical user data revealed a systemic failure of Snap's internal controls over user engagement data that led Snap to inaccurately report other metrics, including Snapchat's registration flow completion rate (the percentage of users who complete the Snapchat registration process after starting it) and user retention rate (the percentage of users who continue to use the application after 7 days).  With respect to both of these metrics, Pompliano alleged that Snap's management was grossly overstating the adoption rate of its product among new users.  For example, whereas Snap represented that 87% of potential users completed the registration process, Pompliano alleged that the data showed that the number was actually less than 40%. Furthermore, whereas Snap represented that it was losing around 60% of its users after 7 days, the data showed that its retention rate was actually closer to 20%.

73.     According to Pompliano, the alleged unreliability of Snap's user engagement data was known to Snap senior management, as he had raised the issue to Spiegel, Vollero, and other senior executives.  Specifically, Pompliano alleged that when he raised the unreliability of these user metrics, Snap's Vice President of

Communications and CFO, Defendant Vollero, acknowledged the user engagement metrics were unreliable. Moreover, Spiegel allegedly dismissed the importance of maintaining the integrity of user data and the accuracy of the Company's public representations, stating that "it was no big deal that Snapchat's public statements that it had over 100 million DAU were false."

74.     In sum, Pompliano's detailed allegations—which were known to Defendants before the Registration Statement was filed—raised questions about the integrity of Snap's critical user engagement data, and suggested a tone at Snap set by Spiegel and Vollero of tolerance of internal control failures involving the fundamental metrics upon which Snap's enterprise was based, and also retaliation against those who questioned these deficiencies.

> ### 5. Facebook Releases a Competing Product Six Months Before the IPO Which Undisclosed to Snap's Investors, Has an Immediate and Dramatic Impact on Snap's Growth

75.     One of Snap's principal competitors is Facebook. In November 2013, driven by declining usage rates among teens, Facebook offered $3 billion to purchase Snap, which was then a fledgling company with little revenue. Spiegel rebuffed the offer. Having failed to acquire the competing platform, Facebook sought to replicate Snapchat's most popular features, including its popular image and location filters that helped fuel Snap's rapid growth. In December 2013, Facebook launched Instagram Direct, a private photo-sharing and messaging service for Instagram that sought to compete with the popularity of Snapchat's direct messaging features.

76.     The turning point came in August 2016, when Instagram released its own version of Snapchat's wildly popular "Stories" feature, which allows users to share multiple photos and videos in a slideshow format. Bearing the identical name, Instagram's Stories was a virtual clone of Snapchat Stories.

77.     Facebook's mimicry of Snapchat went beyond copying popular Snapchat features. Instagram sought to deprive Snap of the essential characteristic that had defined

the Company since its founding: the ephemeral aesthetic.  One of the key innovations for Instagram's users in 2016 was that Instagram added "ephemeral" photo and video messaging capabilities to Instagram Direct, and disappearing posts to Instagram Stories, thus replicating the core functionality that Snapchat used to distinguishing itself from its competitors.  As Snap stated in the Registration Statement, "Snaps are deleted by default, so there is a lot less pressure to look pretty or perfect when creating and sending images on Snapchat."

78.     In a November 2016 interview with *TechCrunch*, Instagram explained why it added "ephemerality" to the range of clone features it had lifted directly from Snapchat:

> "We pivoted" Instagram's head of product Kevin Weil tells me. Instagram should be all of your moments, not just your highlights." Since the new Live and Direct content self-destructs, Instagram hopes users will be less concerned about how they look or if they're doing something cool."

The intent could not have been clearer: Instagram was adopting wholesale the key aesthetic Snapchat had used to distinguish itself from its social media peers.

79.     Undisclosed to investors in Snap's IPO, Facebook's multifaceted replication strategy had an immediate and dramatic impact on Snapchat's user growth and engagement.  As investors would later learn, in the six months preceding the IPO, Instagram had caused a dramatic decline in Snap's DAU growth and other user metrics. As was reported by *Forbes* in April 2017, after the IPO:

> Snapchat has reigned as the kin[g] of ephemeral video since its founding, but Instagram recently stepped in to take [its] shot.  In August 2016, years after Snapchat first released Stories, Instagram released its own version with Instagram Stories. This allowed users to share multiple photos and videos in a slideshow format. It was basically a clone of Snapchat Stories, but even though it was later to the party, engagement quickly started to tip in Instagram's favor.
>
> A report on TechCrunch found that ***Snapchat Stories view counts dipped by 15-40 percent after Instagram Stories launched, and posting volume declined as well.*** Meanwhile, Instagram view counts soared, and most influencers have seen engagement rates that are 3-5x higher on Instagram than on Snapchat. ***Within six months, Instagram Stories hit 150 million daily users, which is only slightly less than the number of daily active users for Snapchat's entire app.*** In early April, Facebook announced that Instagram Stories had reached 200 million daily active users (DAUs) and the media quickly piped to say that Instagram had "officially crushed Snapchat" and Snapchat was "dead."

80.    Former employees confirm that it was known within Snapchat that Instagram Stories was responsible for Snap's decline user growth and engagement. Moreover, the threat of competition by Instagram led Snap's customers to question the value of Snapchat as a platform for advertising, concerns which were directly communicated to Snap's senior management prior to the IPO.

81.    For example, FE 1 revealed that from the second and third quarters of 2016 until the time FE 1 left Snap in the first quarter of 2017, there was an ongoing and widespread concern within Snap regarding Instagram's effect on Snap's ability to compete for advertisers.  FE 1 described how sales teams were nervous because Instagram came up in conversations with Snap's major advertising clients, particularly after Instagram Stories was launched, and the concern about Instagram was always in the background in such conversations.  FE 1 stated that it was known internally at Snap that Facebook was spending a lot of money on Instagram in order to compete with Snapchat. FE 1 revealed that after Instagram launched its Stories function, concerns about Instagram and Snap's ability to compete specifically came up in the sales team's conversations with advertisers.

82.     FE 1 stated that in light of Instagram's release of Stories, Snap's pitch to advertisers centered on Snapchat's authenticity.  FE 1 added that advertisers were told that Snapchat was on an upward trajectory and the advertisers wouldn't want to miss the chance to get in on it. FE 1 noted that these claims were often met with skepticism.

83.    FE 1 explained that the sales team's concerns were relayed to Snap's executive management.  FE 1 stated that sales personnel told Snap's executive management that Snap had to respond to Instagram's Stories launch and asked what they should say to advertisers.  In response, Snap released a statement internally to the Company's employees responding to this concern.  FE 1 stated that this statement by executive management simply touted Snap's ability to innovate and summarily dismissed the concerns about competition.

84.    FE 2 described a January 2017 company-wide meeting held in an airplane

hangar in Santa Monica, which FE 2 characterized as an attempt to host an Apple-style town hall for all employees. At the company-wide meeting, Spiegel held a Q&A session in which he fielded numerous questions from Snap employees concerned about the Company's ability to compete with Instagram and the negative sentiment about Snapchat expressed to sales staff from advertisers. FE 2 recalled that these concerns were met with a dismissive attitude and a vague call to execute on the Company's strategy and not worry about Facebook. FE 2 also recalled the company-wide memo from Spiegel that sought to summarily dismiss the concerns expressed by employees about the impact of competition from Facebook.

85.     FE 2 revealed that in contrast to management's dismissive attitude, Snap sales personnel were left to convince skeptical advertisers of the value of investing in Snap's platform, whose effectiveness was unproven, instead of Facebook or Instagram, with which advertisers were familiar and more confident in their return on investment. FE 2 revealed that in light of the consistent concerns expressed by Snap's advertising customers about the value of Snap's platform, Snap's internal sales projections and assumptions about their ability to grow and monetize their platform were unreasonable. For example, FE 2 revealed that sales teams in different regions, including Dallas, New York, and Chicago were unable to meet the Company's sales targets, which assumed continued exponential growth.

86.     These accounts are corroborated by new reports published after the IPO, which revealed that internally at Snap there was widespread anxiety over Snap's inability to compete with Facebook. For example, as recounted in a *Business Insider* profile of Spiegel published months after the IPO in August 2017:

> Around the time of Snap's initial public offering in early March, employees got a rare chance to ask the CEO, Evan Spiegel, anything on their minds.
>
> Unlike the "town hall" meetings at Google, Facebook, and other tech companies, the Q&A at Snap was a written affair. Using a shared document, employees submitted questions to the company's 27-year-old leader.
>
> The result revealed a common anxiety: About one dozen of the questions were a variation of whether employees should worry about Snapchat's competitors, particularly Facebook and Instagram, which appeared to be crimping

Snapchat's rapid growth.

87. Consistent with the accounts of Snap former employees, the report revealed that Spiegel minimized the risk of competition from Instagram, dismissing the concerns of his employees:

> Spiegel's responses were short, and the one-word answer "no" was all that was written next to some of the queries, according to multiple people with knowledge of the document. Other answers of Spiegel's explained how employees should not think about the competition and should instead focus on delivering the best products and on innovating.

### 6. Faced with Declining User Growth and Engagement, Snap Rushes to Go Public

88. Faced with aggressive competition from Facebook, Snap's window of opportunity to take the Company public at the highest possible valuation was closing, and so Defendants raced to bring Snap public.

89. In an October 8, 2016 article, *Business Insider* noted that "For now, momentum continues to swing in Snap's favor, despite increased pressure from rivals like Facebook-owned Instagram." However, the article noted that "Snapchat's position as the hottest app in tech could become precarious if it ever hits a plateau in user growth."

90. Snap's sudden rush to go public did not go unnoticed. For example, in a November 16, 2016 article, *Fortune* wondered "Why Is the Most Secretive Company in Such a Hurry to Go Public?" questioning why "the most secretive company in the world wants to force itself to start sharing."

91. Snap's eagerness to tap into public investors as a source of capital surprised even its own venture capital backers. For example, in a February 2, 2017 interview with *Forbes*, General Catalyst partner Hemant Taneja, whose firm invested $10.5 million in Snap beginning in 2013, acknowledged that the IPO "definitely happened faster than I thought" and that he was surprised that "they're going to go tap the public markets already."

92. Market analysts at the time of the IPO also noted that Snap's decision to go public came much earlier than its social media peers such as Facebook and Twitter in

terms of their monetization of their user base and overall profitability.

93.    Fortunately for Snap, its IPO was hotly-anticipated among investment banks, in part because 2016 represented a low-point for IPO activity in the U.S., with the least number of new companies going public since the financial crisis.  Moreover, Snap was the first U.S.-based social-media company to go public since Twitter, Inc. in 2013. Snap thus found willing counterparts in the Wall Street investment banks who agreed to tout Snap to investors in exchange for lucrative commissions.

94.    The *Los Angeles Times* summed up the frenzy surrounding Snap's IPO on October 7, 2016, stating: "For years, Los Angeles' tech industry has been waiting for its big day: image-sharing app Snapchat's initial public offering.  Now the region's engineers and investors may finally be able to start circling dates on the calendar."

### B.    Snap's IPO

95.    On February 2, 2017, Snap filed a preliminary version of the registration statement and prospectus with the SEC on Form S-1, and filed amendments thereto on Form S-1/A on February 2, 2017, February 9, 2017, February 16, 2017, and February 27, 2017, respectively.  The Registration Statement was signed by the Executive Defendants and was declared effective by the SEC on March 1, 2017.

96.    In contrast to Snap's early investors and the Wall Street banks that shepherded Snap to its IPO, average investors were left to rely on Snap's public filings in order to assess the risks of their investment.  Unfortunately for these investors, Snap's Registration Statement painted a false portrait of a quickly growing Company on the verge of sustained, profitable growth.  In doing so, the Registration Statement failed to disclose the known impact that Instagram's clone Stories function was having on Snap's user growth and engagement.  Moreover, Defendants failed to disclose Pompliano's detailed, credible allegations, filed under seal in January 2017, regarding Defendants' knowing misrepresentation of its user engagement metrics and severe internal controls deficiencies, rendering its risk disclosures regarding its user engagement metrics materially false and misleading.

1
2
3

**1.    The Registration Statement Falsely Touts Snapchat's Rapid Growth and Conceals the Known Impact Instagram's Stories had on Snap's User Growth and Engagement**

4
5
6

97.    The Registration Statement touted the fact that Snap "had 158 million Daily Active Users on average in the quarter ended December 31, 2016*, an increase of 48%* as compared to our Daily Active Users in the quarter ended December 31, 2015."

7
8
9

98.    The Registration Statement included the following chart on DAU growth showing the above growth quarterly growth trends:

10
11
12
13
14
15
16
17
18
19
20



21
22
23
24

99.    In addition, the following chart in the Registration Statement illustrated Snap's quarterly growth trend in DAUs separately for North America, Europe and the Rest of the World:

25
26
27
28

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS



100.   The geographical breakdown Snap provided is especially significant, because as Snap stated in the Registration Statement, "Our products often require intensive processing and generate high bandwidth consumption by our users.  As a result, our users tend to come from developed countries with high-end mobile devices and high-speed cellular internet."  Further, Snap stated in the Registration Statement that "We expect growth to continue to come from developed markets with readily available high-speed cellular internet and high-end mobile devices because we prioritize our investment in product innovation that often requires a lot of bandwidth and intensive processing."

101.   In explaining the data provided in the Registration Statement, Snap assured investors that while "[t]he rate of net additional Daily Active Users was relatively flat in the early part of the quarter ended December 31, 2016," the Company's user growth had "historically experienced lumpiness in the growth of our Daily Active Users" and "*accelerated in the month of December*."  Snap explained this relatively flat DAU growth as being "***primarily related to accelerated growth in user engagement earlier in the year,*** diminished product performance, and increased competition."  However, Snap qualified that "We believe that diminished product performance and increased competition especially impacted the growth of our Daily Active Users *outside of North America and Europe.*"

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

102.   The Registration Statement emphasized that with respect to DAU growth in its core developed markets in North America and Europe, the slowing growth in DAU was a function of "*increased user engagement.*"   According to the Registration Statement: "The rate of net additional Daily Active Users accelerated in the first half of 2016 compared to the second half of 2015, *largely due to increased user engagement from product launches and increased adoption rates among older demographics*." Snap explained that "This created a higher baseline of Daily Active Users heading into the third and fourth quarters, so incremental net additions within these quarters were more difficult even with strong year-over-year growth."

103.   Similarly, with respect to "diminished product performance," the Registration Statement falsely assured prospective investors that these non-specific technical issues were primarily responsible for any observed slowdown in Snap's user growth, and further that these issues were localized outside of Snap's core North American and European markets, stating that "in mid-2016, we launched several products and released multiple updates, which introduced a number of technical issues that diminished the performance of our application.   We believe these performance issues resulted in a reduction in the growth of our Daily Active Users, particularly among Android users."   Snap added that "We believe that the effect of some of these factors is amplified in countries outside of North America and Europe due to infrastructure and user behavior."

104.   Snap minimized the impact of competitive pressures on the Company's slowing user engagement growth.   For example, among "factors that *could* negatively affect user retention, growth, and engagement," the Registration Statement listed "users increasingly engage with competing products instead of ours."   The Registration Statement also noted that "our competitors *may* mimic our products and therefore harm our user engagement and growth."   However, Defendants maintained that these competitive risks were only potential risks and not circumstances that had already transpired and were presently harming the Company's user engagement and growth.

105.   In particular, the Registration Statement noted that "Instagram, a subsidiary of Facebook, recently introduced a 'stories' feature that largely mimics our Stories feature and *may* be directly competitive."  In actuality, Facebook's consistent rollout of features mimicking Snap's were, at the time the Registration Statement was published, known by Snap's management to be eroding Snap's user engagement and posing an existential threat to the Company.

106.   The materially false impression created by the Company's statements in the Registration Statement that Instagram's competition was merely a potential risk is belied by the accounts of former Snap employees, who reveal that from the second and third quarters of 2016 there was an ongoing concern within Snap regarding Instagram and its impact on Snap's user growth and engagement and, as a result, its ability to compete for advertisers.  Snap's senior management specifically responded to these concerns raised by employees by attempting to minimize the risk associated with Instagram's directly competitive Stories function.

107.   Indeed, as would only be revealed after the IPO, Instagram replication of Stories had an immediate and dramatic impact on Snapchat's user growth and engagement, as reflected in the following chart:



108.   The trend above was known to Snap's senior management prior to the IPO. Indeed, news reports issued after the IPO confirm widespread anxiety among Snap's

employees about the impact of competition from Facebook on Snap's user growth.

109.   Despite internally recognizing that the limited pool of potential Snap users was being rapidly drained by its chief competitor and that Instagram user metrics were eclipsing Snap's, Snap included only a boilerplate risk disclosure regarding the potential for declining user growth and engagement, stating among its "Risk Factors":

> We had 158 million Daily Active Users on average in the quarter ended December 31, 2016, and we view Daily Active Users as a critical measure of our user engagement. Adding, maintaining, and engaging Daily Active Users have been and will continue to be necessary. *We anticipate that our Daily Active Users growth rate will decline over time if the size of our active user base increases or we achieve higher market penetration rates.*

### 2.   The Registration Statement Conceals Credible Allegations that Snap's User Metrics Were Unreliable

110.   Snap's Registration Statement assured investors that with respect to the key user metrics Snap cited throughout the IPO, they were "calculated using internal company data" and "are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement." However, the Registration Statement disclosed that "We regularly review, have adjusted in the past, and are likely in the future to adjust our processes for calculating our internal metrics to improve their accuracy."

111.   Yet, undisclosed to investors, the key user engagement metrics upon which the Company's advertising customers relied had long been the subject of internal controversy at Snap.

112.   The materiality of any perception in the unreliability of these metrics was clearly understood by Snap as it noted in the "Risk Factors" section of the Registration Statement, "Our user metrics and other estimates are subject to inherent challenges in measurement, and *real or perceived inaccuracies* in those metrics may seriously harm and negatively affect our reputation and our business." Snap further disclosed that its advertising revenue could be "seriously harmed" in the event of changes in "advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat."

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

113.   Specifically, the Registration Statement indicated:

If advertisers, partners, or investors do not perceive our user, geographic, or other demographic metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user, geographic, or other demographic metrics, our reputation may be seriously harmed.  And at the same time, advertisers and partners may be less willing to allocate their budgets or resources to Snapchat, which could seriously harm our business.

114.   Despite warning investors of the potential risk posed by *perceived inaccuracies* in the reliability of Snap's user metrics, the full extent of the Company's disclosures as it related to the historical reliability of its user metrics was limited to  the following:

In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate.  For example, before June 2015, we used a third party that counted a Daily Active User when the application was opened or a notification was received via the application on any device.  We now use an analytics platform that we developed and operate and we count a Daily Active User only when a user opens the application and only once per user per day.  We believe this methodology more accurately measures our user engagement.  Additionally, to align our pre-June 2015 Daily Active Users with this new methodology, we reduced our pre-June 2015 Daily Active Users by 4.8%, the amount by which we estimated the data generated by the third party was overstated.  Since this adjustment is an estimate, the actual pre-June 2015 Daily Active Users may be higher or lower than our reported numbers.  As a result, our metrics may not be comparable to prior periods.

115.   Omitted from this disclosure was the highly material fact that the changes Snap had made to its historical methodology for assessing Daily Active Users were prompted by an internal whistleblower, Pompliano, who had since filed a retaliatory discharge lawsuit based on his firing for raising these issues.  Snap failed to disclose Pompliano's credible allegations that Snap had historically misstated its user metrics due to a failure to maintain proper internal controls over its user data.

116.   Snap's omission of Pompliano's allegations and the ongoing controversy surrounding the reliability of Snap's user engagement metrics rendered their discussion of the risks posed to Snap due to a change in advertisers' perception of the business materially misleading.  Regardless of whether Snap disputed Pompliano's claims, as Snap noted in the Registration Statement, even the prospect of his credible allegations

leaking out posed a material threat to Snap's fledgling advertising business and its ability to compete with Instagram.  Failing to fully disclose Pompliano's allegations, or the nature of his sealed lawsuit, constituted a material omission that rendered the Registration Statement misleading.

117.   In addition, Defendants had a duty to disclose Pompliano's complaint under General Accepted Accounting Principles ("GAAP").  Specifically, under Accounting Standards Codification Topic 450 ("ASC 450"), which governs the disclosure and accrual of contingencies by public companies in their reports filed with the SEC, if the likelihood of a material loss is "reasonably possible," i.e., more likely than remote, but less likely than probable, and the amount of the reasonably possible loss is estimable, then a company must disclose the nature of the contingency and also provide its estimate of the amount or range of loss.  Otherwise, if the reasonably possible loss is not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

118.   ASC 450-20-55 provides examples of loss contingencies covered by ASC 450 and, as pertinent here, specifically includes "litigation, claims, and assessments."  At minimum, ASC 450-20-55-13 provides that a loss contingency involving a filed claim must be disclosed if there is a reasonable possibility that the outcome will be unfavorable. Thus, in cases where the filed claim has not yet been resolved, but an unfavorable outcome is reasonably possible, ASC 450 requires a public company to disclose the nature of the contingency and any amount of loss that is reasonably possible.  ASC-450-20-55-31.

119.   Despite having a duty to do so, Snap failed to disclose Pompliano's complaint in its discussion of litigation-related risk facing the Company.  Given that, according to the Registration Statement, *"real or perceived inaccuracies* in [Snap's user metrics] metrics] may seriously harm and negatively affect our reputation and our business," Pompliano's allegations posed a risk of material loss that was at least reasonably probable, regardless of whether Snap disputed Pompliano's claims.

### 3.    Snap's Roadshow: The Underwriters Help Cement the Company's False News Growth Narrative

120.    In February 2017, the Company went on a road show with it underwriters to promote its impending IPO.  Each of the underwriters participated in the roadshow, which hosted investors at least nine different events in cities including New York, Boston, Los Angeles, San Francisco, and London.   Representing Snap were Defendants Spiegel, Vollero, and Khan.

121.    The roadshow materials amplified the Registration Statement's portrayal of Snap having a rapidly growing and highly engaged daily user base that was on the cusp of being profitability monetized.  Furthermore, Defendants dismissed any concerns about slowing growth or Snap's seemingly improbable valuation.  As was reported in Forbes at the time of the roadshow:

> In a room of more than 400 investors on the 36th floor of New York's Mandarin Oriental Hotel, Spiegel brushed aside concerns of slowing user growth and stressed Snap's potential to change "the way people live and communicate," according to sources who asked not to be identified because the meeting was closed to the press.

122.    As part of the Company's roadshow presentation, Khan touted that Snap's "users come to Snapchat almost every waking hour."  Khan emphasized the opportunity Snap presented for advertisers to capture a coveted demographic, stating that "the majority of [Snap's] users [were] between the ages of 13 and 34" and that these "users represent a big opportunity for us, because they're harder to reach on traditional media and they're often highly sought after by advertisers."

123.    Khan highlighted the Company's user engagement metrics, touting that "any given day, more than 60% of our daily users are using our cameras to express themselves."

124.    With respect to profitability, Vollero emphasized that "our platform monetization is real, it's growing, and it's sustainable."  In support of these claims, Vollero cited the Company's user engagement metrics:

> We measure engagement in our community through daily active users (what we call DAU), because we believe that daily investment in the form of energy

and creativity is the most reliable way to understand engagement. Growth in user engagement is a key metric for us. Over the last three years, users have grown from 71 million in the fourth quarter of 2014, to 107 million in the fourth quarter of 2015, to 158 million in the quarter ending December, 2016. As of the fourth quarter of 2016, our DAU have grown 48% compared to the same period last year.

125. Vollero added that the "combination of an engaged user base and great ad products is producing powerful results. Our business is scaling quickly as advertisers have really had some impressive wins using SNAP."

### 4. As Snap Goes Public, Defendants and Other Insiders Cash Out, and the Underwriters Reap Hefty Commissions

126. Defendants completed Snap's IPO on March 3, 2017, utilizing a Form S-1 Registration Statement, declared effective by the SEC on or about March 1, 2017. The IPO raised $3.4 billion from investors by selling 200 million shares of Snap common stock at $17 per share.

127. Snap's IPO valuation delivered a long-awaited payday to its venture capital backers. In particular, Lightspeed Venture Partners ("Lightspeed") and Benchmark, who together owned approximately 20% of Snap prior to the IPO, cashed in as soon as Snap rang open the opening bell. Lightspeed, which initially invested in Snap in 2012, owned over 80 million shares worth over $2 billion based on Snap's asserted $17 valuation at the time of the IPO. Benchmark owned more than 120 million shares, having reportedly invested $13.5 million in 2013 when Snap was valued at approximately $70 million. At the time of the IPO, Benchmark's shares were worth approximately $3 billion. In connection with the IPO, Lightspeed sold 4.6 million shares worth approximately $78 million at the IPO price. Benchmark sold 10.7 million shares worth over $181 million at the IPO price, thus reaping a 1340% return on its $13.5 million initial investment, just from the shares it sold.

128. Defendants Spiegel and Murphy, unlike Snap's many employees who were subject to lock-up periods, cashed in as well. Spiegel and Murphy each sold 16 million shares valued at $272 million.

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

129.   All told, Snap insiders, including the Executive Defendants, sold over $900 million in shares as part of the IPO.

130.   Snap's IPO had the added twist of offering only non-voting stock to public investors.  As Snap stated in the Registration Statement, "to our knowledge, no other company has completed an initial public offering of non-voting stock on a U.S. stock exchange." Given the Company's unprecedented issuance of non-voting shares to public investors, despite their payday, Defendants Spiegel and Murphy managed to retain control of approximately 88.5% of voting stock.

131.   Pumped up by Defendants' misleading Registration Statement and offering materials, on the day of the IPO, Snap's stock price soared to a Class Period high of $29.44 per share.

### 5.    The Underwriter Banks Initiate Coverage with Price Targets Well Above the IPO Price

132.   Snap's IPO valuation was based in part on a multiple of future earnings. In other words, despite the fact that the Company had never generated a profit and its disclosed expenses more than doubled its revenues, at the time it went public, the Underwriters priced Snap based on its future potential to turn a profit.  Accordingly, the Company's anticipated growth trajectory based on its current user growth trends was the essential data point in valuing Snap's stock.

133.   After Snap's IPO, buy-side securities analysts working for the underwriters initiated coverage of Snap with price targets well above the IPO price, representing significant premiums over even the Underwriters' asserted $17 per share valuation.  The investment theses of these firms read as if they were lifted straight from Snap's Registration Statement.

134.   Morgan Stanley, the lead underwriter in the IPO, initiated coverage of Snap on March 28, 2017, rating Snap shares as overweight and setting a price target of $28. In support of its assessment, Morgan Stanley noted Snap's "engaged/hard-to-reach millennial users," stating that "We are bullish about Snap's ability to monetize its highly

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

engaged daily active user (DAU) base (~160mn DAU spending an average of 25-30 mins/day)." Other analysts echoed Morgan Stanley's valuation analysis. For example:

    a. Deutsche Bank initiated coverage with a "Buy" recommendation, setting a $30 price target premised on Snap being "an attractive opportunity to buy the next great mobile ad business amidst a sea of investor skepticism." The report concluded that "several key investor concerns" such as the Company's current lack of profitability and the threat of competition, were "overblown," and that Snap's opportunities in the areas of user engagement and monetization were "underappreciated by investors."

    b. J.P.Morgan initiated coverage with a year-end price target of $24. In support of its valuation, J.P.Morgan noted "Snap's camera-first social platform has a highly engaged and attractive user base with significant monetization runway."

    c. Similarly, Barclays initiated coverage with a year-end price target of $24, *highlighting* the fact that Snap was "significantly under-monetized" as a reason for it being valued at a multiple of 13 times 2018 projected earnings. In Barclays view, because Snap lacked current revenues it "should have a relatively easy path to $3B+ in revenue primarily from higher ad load."

    d. Credit Suisse set a price target of $30 and asserted that Snap shares were "a scarce asset" and "a margin expansion story."

135. In the months following the IPO, the representations in the Registration Statement and other offering materials were echoed by numerous analysts. For example, on March 14, 2017, S&P Capital IQ predicted Snap revenues of "$1.0 billion in 2017, $2.0 billion in 2018 and $3.0 billion in 2019. We anticipate these gains being driven by greater user adoption and usage, more offerings and features, geographic expansion, and an increasing focus on monetization." Similarly, on March 27, 2017, Jefferies reported that "Snap looks well positioned for growth as advertisers clamor to serve ads to its large audience of deeply-engaged users, many of whom are in the attractive millennial

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

demographic and are located in high-value ad markets."  With respect to its chief competitor, the report noted that Facebook's average revenue per user ("ARPU") was "around 9x higher than Snap's ARPU" but that the analysts expected "sharp ARPU growth as this gap narrows."

136.   In anticipation of the Company's first quarter operating results, including its all-important DAU metric, analysts predicted an acceleration in new DAU, highlighting Defendants' explanations in the Registration Statement for the recent slowdown in DAU growth.  For example, in a report on April 12, 2017, Barclays cited *"management's commentary that December was a good month and 'back on track'" as a reason for "a DAU that is better than the +6m adds in 4Q."*

## VI. THE TRUTH IS GRADUALLY REVEALED

### A.    Pompliano Blows the Whistle on Snap's Allegedly Unreliable User Engagement Metrics

137.   Pompliano filed a complaint against Snap in Los Angeles Superior Court for violation of California's labor laws ("Pompliano California Complaint") in January 2017. The initial complaint was filed under seal, with only a heavily-redacted version available for the public.  On May 16, 2017, Pompliano filed a complaint in the United States District Court for the Central District of California (the "Pompliano Federal Complaint"), alleging violations of the Dodd-Frank Whistleblower Statute, and other claims, based on the same allegations as his state complaint.  With the exception of several exhibits, the Pompliano Federal Complaint was not redacted.

138.   In his complaints, Pompliano alleges that he was fraudulently induced to join Snap based on the Company's representations of double-digit, month-over- month growth in its active user base, and that it had already acquired 100 million daily active users.

139.   Pompliano recounts that once he joined Snap, he discovered that these representations were false and that the company used these same false metrics in representations to advertisers, the public, and to private investors when raising capital.

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

Pompliano urged Snap to make corrective disclosures by reporting the issue to the highest levels of management, but he was rebuffed.

140.   Pompliano describes how his efforts to expose and remedy the falsity of the Company's user engagement metrics resulted in his wrongful termination, and that after he was terminated, Snap sought to destroy his career and reputation by making false representations concerning the circumstances of his termination.

141.   Pompliano recounts how during the course of Snap's aggressive efforts to recruit him, Khan and Brian Theisen ("Theisen"),[2] Snap's then-Director of Business Operations, repeatedly represented that Snap was experiencing double-digit, month-over-month growth in its DAU, and further represented that the company was the fastest on record among social media platforms to acquire 100 million DAU.

142.   After he joined Snap, Pompliano recounts that he met with his initial team members, data analysts Jie Liu ("Liu") and Shizhang "Ben" Wu ("Wu"), both of whom Pompliano knew as former Facebook analysts.  These analysts revealed to Pompliano Snap's "institutional aversion" to analyzing user data and that its current user engagement metrics were "completely unreliable."  Pompliano explains that Liu and Wu walked Pompliano through various data that demonstrated Snap's inability to reliably measure user engagement. Pompliano also discovered that at the time of his employment, Snap had virtually no internal controls in place to verify the accuracy of user engagement data.

143.   Based on what he learned from these analysts, Pompliano describes how he ran tests to verify all of Snap's user engagement metrics.  Pompliano sought to obtain the current metrics concerning Snap's DAU and its historical active user growth rate. However, Pompliano recounts that Snap did not have a reliable method in place to measure its DAU at this time.  Instead, Snap relied on two different programs and data sets, both of which were known to be inaccurate.  The first method used a program called Flurry, which was based on external analytics and included in its count a variety of push

---

[2] Theisen recently changed his last name to Ames.

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

notifications (i.e., messages sent by Snapchat to users, which, if opened, would count as user activity even if the user did nothing further) and led to overstated DAU.  The second method used a program called Blizzard that was based on an internal data pipeline and undercounted DAU because it missed older users.  According to Liu and Wu, Snap had no way of knowing which of the two measurements, if either, was accurate.  Instead of trying to reconcile the internally competing data, and ensuring that they were relying on accurate metrics, Snap "merely picked numbers at random that they guessed were accurate."

144.   Pompliano alleges that when he reviewed the results from these two programs, even the exaggerated count generated by Flurry showed only 97 million DAU, while Blizzard showed only 95 million DAU, significantly less than the 100 million DAU Snap claimed it had already achieved long ago.

145.   Based on these results, Pompliano asked his team to obtain all of the available data going back to January 1, 2015, to conduct further due diligence. Pompliano alleges that the more he investigated, the less reliable Snap's user engagement data became.  Pompliano alleges that he applied a variety of analytical tools to rigorously measure DAU at several points between January 1, 2015, and September 1, 2015.  The data revealed that Snapchat's purported double-digit month-over-month DAU growth rate was false and grossly overstated.  In fact, during this timeframe Snapchat's DAU growth rate ranged from 1% to 4% per quarter, a small fraction of the double-digit month-over-month DAU growth Snap claimed.

146.   Pompliano alleges that his investigation revealed a systemic failure in Snapchat's internal controls over critical user engagement data.   For example, Pompliano's investigation revealed that major inaccuracies in Snapchat's registration flow completion rate (the percentage of users who complete the Snapchat registration process after starting it).  Pompliano learned that while Spiegel and others on the executive management team were representing that 87% of potential users completed the registration process, the data showed that the number was, in fact, less than 40%.

Furthermore, Pompliano determined that another key metric used by Snapchat, its user retention rate, was woefully inaccurate. Whereas the Company had been representing that it was losing around 60% of its users after 7 days, resulting in a roughly 40% retention rate, the data showed that its retention rate was, in fact, closer to 20%.

147. In sum, Pompliano alleges that there were serious issues at every level of Snap's user engagement data. These issues included not only major inaccuracies in the final reported metrics, but also serious deficiencies in how Snapchat's data tools and products were implemented, monitored, and supported.

148. Given these glaring issues with the reliability of Snap's user engagement data, Pompliano alleges that Snap was misleading advertisers, and investors. For example, Pompliano alleges that he saw hard copies of marketing brochures used to solicit advertisers that represented that Snapchat had over 100 million DAU, when at the time, the number was significantly lower and closer to 80 million.

149. Pompliano recounts how he raised the discrepancy between Snap's internal user engagement data and the representations it was making to advertisers to Jill Hazelbaker ("Hazelbaker"), Snapchat's former Vice President of Communications. Hazelbaker had joined Snap just a year earlier from Google. Pompliano revealed how Hazelbaker told him that she too was aware of the issue and had repeatedly raised it internally, but was ignored. Hazelbaker left Snap in October 2015.

150. Pompliano also alleges that he informed Khan about his findings concerning Snap's wildly inaccurate user engagement metrics. Khan agreed to arrange a meeting with Spiegel so that Pompliano could present his findings.

151. In preparation for the meeting, Pompliano (with the assistance of Snap engineers, data analysts, and Theisen) created a PowerPoint presentation to interpret and summarize the results of his deep analytics applied to Snap's data, in order to give Snap's executive management team an accurate picture of Snap's true user metrics and to identify the errors he found in several of Snap's user engagement metrics, including its DAU, active user growth rate, user retention rate, and user registration completion rate.

To ensure the accuracy of the findings, Pompliano circulated drafts of his presentation to a number of analysts to confirm the underlying data and obtain their input prior to the presentation. Pompliano also solicited the input of many other Snap executives and sent the presentation to the persons who were scheduled to attend the meeting, including Defendants Spiegel and Khan.

152. Pompliano's presentation was filed under seal with the Court as an exhibit in support of his federal complaint. *See Pompliano v. Snap, Inc.,* Case No. 2:17-cv-3664, ECF No. 1-4. The body of the complaint included an un-redacted version of page 4 of the presentation:



153. As alleged in Pompliano's federal complaint:

[Pompliano's] presentation to Snapchat identified the underlying problem in clear terms: the data upon which Snapchat relied (and which it was disseminating to advertisers and investors, among others) was "unreliable and inaccurate." In the interests of preventing future harm to Snapchat, the presentation confronted Snapchat's senior management with the undeniable truth that Snapchat's own data was internally contradictory, Snapchat was missing basic measurement tools, key positions on Snapchat's growth team were still unfilled, and that "[f]ew people ha[d] confidence in [Snapchat's] data."

*Id.*, ECF No. 1 at ¶76.

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

154.   Pompliano alleges that he communicated to Spiegel and Khan and the other Snap executives that "[a]lthough Snapchat executives were publicly boasting about their growth, internally, Snapchat personnel were sounding the alarm that such growth was unsustainable (and indeed, already slowing)."

155.   Pompliano details a meeting with Defendants Spiegel and Khan on September 11, 2015.  Pompliano recounts how Spiegel was "enraged throughout the meeting and refused to listen to anything Mr. Pompliano said, constantly cutting him off and summarily dismissing his points."  In response, Pompliano explained that he and Snap's analysts and engineers had examined the data carefully, and the results were accurate.

156.   Pompliano alleges that Spiegel stated that "it was no big deal that Snapchat's public statements that it had over 100 million DAU were false."

157.   Pompliano also recounts a meeting with Vollero during which Vollero admitted that the metrics Snapchat had been using were wrong, and therefore their representations were inaccurate and should be corrected.

158.   Pompliano alleges that as a result of presenting these results and insisting that Snap stop misrepresenting its user metrics, Snap executives conspired to have him unjustly terminated.  On September 18, 2015, Pompliano was terminated.  Pompliano recounts how during his final meeting with Snap he was told that the directive for him to be terminated came from Spiegel.

159.   Pompliano further alleges that Snap took preemptive measures to discredit him, including by telling high-ranking executives in the social media industry that Pompliano was terminated three weeks after he was hired because he was incompetent.

## B.   Snap Denies All of Pompliano's Allegations Prior to the IPO

160.   The Pompliano California Complaint was initially filed under seal on January 4, 2017.  *Business Insider* reported on January 5, 2017 that Snap immediately denied the allegations, stating that the Pompliano California Complaint "has no merit" and was "totally made up by a disgruntled former employee."

161. Snap's public denials continued. On January 18, 2017, the Company moved to maintain the Pompliano California Complaint under seal, stating in a public filing that Pompliano's complaint was a "late-breaking bid" to air "sensationalist allegations" as Snap prepared for its IPO. Furthermore, Snap derided Pompliano's allegations, stating that his "allegations against Snap are false from top to bottom and right out of his allege-fraud-against-former-employers playbook."

162. Notably, despite describing a number of other pending litigation matters, the Registration Statement did not identify Pompliano's lawsuit as a pending matter nor describe the nature of its claims.

### C. After the IPO, New Details About Pompliano's Allegations Emerge

163. On April 4, 2017, it was reported by *Business Insider* that Pompliano had moved to unseal the Pompliano California Complaint. The report noted that, according to newly-released details about the Pompliano California Complaint, "[c]urrently redacted portions of Pompliano's lawsuit contain user metrics that he claims are different from what Snap told investors and the press ahead of its February IPO." The report revealed that Pompliano alleged that "Snap's outsized valuation is built on a house of cards" that has been "systematically built through a coordinated effort from Snap's executives to personally reward themselves with billions of dollars by maliciously manipulating metrics, suppressing metrics that put the company in a negative light, and even, at times, blatantly misleading professional investors, employees, advertisers, and now, retail investors."

164. In response to this news, which was released to the market in the afternoon of April 4, 2017, Snap's share price fell approximately 7.3%, from a close of $22.35 per share on April 3, 2017 to close at $20.70 per share on April 5, 2017.

165. On April 10, 2017, Snap strategically filed an unsealed version of Pompliano's state complaint, claiming that it "ha[d] nothing to hide." While the Company attempted to discredit Pompliano, their decision to publicly file Pompliano's complaint only bolstered his allegations. For example, in the Company's public filing,

Snap stated that it "was not telling advertisers or investors in mid-2015 that the app had over 100 million DAUs.  That, no doubt, is why Pompliano fails to identify who made these supposed statements, to whom they were made, or how he is aware of them" (emphasis in original).

166.   In reality, there is ample evidence that Pompliano is correct that the Company falsely represented that Snap had reached 100 million DAU long before it had actually achieved this important milestone.  For example, at a tech conference called "Code," which was held in Palos Verdes California on May 26-28, 2015, Spiegel told a packed auditorium that "Snapchat has close to 100 million daily active users *'in developed countries.'*"  Dylan Tweney, "Engagement to die for: Snapchat has 100M daily users, 65% of whom upload photos," *VentureBeat* (May 26, 2015).  Spiegel's claim is belied by the Registration Statements, which shows that as of the second quarter of 2015, Snap had only 86 million DAU.

167.   While the crux of Pompliano's allegations had already been revealed to the market, commentators took notice of the fact that the additional details corroborated one of Pompliano's core allegations: Snap had been forced to restate its historical DAU numbers due to its reliance on third party measurement applications it knew to be false.  While Snap characterized this fact as "a musty, two-year-old allegation about a minor metrics deviation," and derided Pompliano's state complaint as "ginned up" and "just one big publicity stunt," Snap's denials could not overcome the fact that the Registration Statement had confirmed part of Pompliano's allegations.

168.   For example, on April 13, 2017, *Fortune* magazine posted an in-depth analysis of Pompliano's allegations to its website.  The article noted that Snap's "investors have reason to pay attention" because, despite the Company's claims that it had nothing to hide, "the unsealed lawsuit contains some key statistics that Snapchat has never before disclosed, not even to investors."  The article noted that while Snap contended that Pompliano was "'fired for poor performance,' he was right about one important thing: Around the time Snap began selling ads on the platform, Snapchat was

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

not as popular as most people thought it was."  The article continued that while "Snap vociferously denies misrepresenting its user metrics . . . what Snap does not dispute is that the discrepancy underlying Pompliano's argument actually existed."  The article concluded that *"[f]or investors, though, whether or not Snap exaggerated the user number matters less at this point than the fact that Pompliano's lower number turned out to be right."*

169.  The accuracy of Pompliano's allegations regarding Snap's misstated historical user engagement data confirmed that Defendants had concealed a known material risk that his allegations would result in "perceived inaccuracies" in Snap's user engagement metrics, which the Registration Statement conceded "may seriously harm and negatively affect our reputation and our business" due to changes in "advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat."

### D.     1Q 2017 Results

170.  The truth concealed by the Exchange Act Defendants' false and misleading statements and omissions regarding the impact that Instagram Stories was having on Snap's user growth and engagement began to emerge on May 10, 2017, when Snap announced its financial results for the first financial quarter of 2017, which revealed disappointing user growth.  Snap's first quarterly results as a public company began to reveal to the market that the Exchange Act Defendants had made materially false and misleading statements and omitted material adverse facts about the Company's user growth and the impact of competition from Instagram in the Registration Statement.  In a press release issued after the market closed, Snap reported that "DAUs grew from 122 million in Q1 2016 to 166 million in Q1 2017, an increase of 36% year-over-year. DAUs increased 5% quarter-over-quarter, from 158 million in Q4 2016."

171.  In response to the news of Snap's disappointing user growth Snap's share price declined $4.93 per share, or approximately 21%, from a closing price of $22.98 on May 10, 2017, to close at $18.05 per share on May 11, 2017.

172.    Analysts cited Snap's disappointing DAU growth in particular as a cause for the stock price decline on this date.  For example, Morningstar reported on May 10, 2017 that "growth in daily average users, or DAUs, was disappointing."  Similarly, Piper Jaffray reported that Snap's "user growth and ad load ramp [was] underwhelming given the company's valuation" and that "[l]acking DAU and revenue upside in the first quarter as a public company means SNAP is now firmly in the penalty box."

173.    As TechCrunch reported on May 10, 2017, "Snap's growth rate increased just a little in Q1 2017 – a bad start to its first quarterly earnings report since going public."  Market commentators uniformly attributed Snap's slowing user growth to direct competition from Instagram.  For example, *VentureBeat* reported on May 10, 2017 that "Facebook's plan worked: Snapchat hits 166 million users, 34 million fewer than Instagram Stories."  The report explained:

> Let's recap how this happened: Facebook launched Instagram Stories in August 2016, a completely transparent effort to rip off the formula that made Snapchat a success (and slow down Snapchat's growth in the process). Facebook's attempts to copy Snapchat usually fail — Poke, Slingshot, etc. — but Instagram Stories took off.

> Investors were sweating over Snap's growth last month after Facebook said Instagram Stories had reached 200 million users — way above the 158 million users Snapchat had in December. Now it looks like they had good reason to worry. Going into the second quarter of 2017, Instagram Stories is both bigger than and growing faster than Snapchat.

> Snapchat hitting 158 million users in 2016 was significant (the service grew 48 percent in one year), but the app's growth significantly slowed down by the end of the year. Snapchat added 5 million users in Q4 2016, and just a little more in Q1 2017 (8 million). Compared to early 2016, this growth rate sucks, and the change correlates with the rise of Instagram Stories.

174.    Analysts also concluded that Snap's quarterly results belied Defendants' public statements about Snap's ability to compete.  For example, Barclays reported on May 11, 2017 that "the 7m DAU net-adds were not strong enough to disprove the 'Facebook is crushing Snapchat' thesis, which we think persists for a while."  Similarly, TechCrunch highlighted that "Competitor Instagram Stories, with 200 million daily actives, remains larger than Snap's entire app, which is further dwarfed by Instagram Direct's 375 million monthly users and the whole Instagram app's 700 million monthly

users."

### E. The Exchange Act Defendants Attempt to Prop Up Snap's Declining Stock Price with Additional False and Misleading Statements

175. After Snap reported its disappointing results for the first quarter of 2017, Defendants falsely assured investors that, despite disappointing quarterly results, Snap's user engagement was steadily growing.

176. During a conference call with analysts and investors after the market closed on May 10, 2017, Spiegel stated that during the first quarter, Snap saw a "significant increase in engagement, with now over 3 billion Snaps created every day with our cameras, generating an increase in overall sessions and time spent."

177. Similarly, Khan stated that the Company was "really excited about the progress we have made increasing engagement across Snapchat," reiterating that "time spent for our users continues to grow." Khan touted the fact that "On average, in Q1 our users spent over 30 minutes per day on Snapchat."

178. Vollero echoed the Company's praise for its first quarter, stating that "Growth in new users, engagements, and year-over-year revenues highlighted our first-quarter results."

179. Despite the positive statements issued by the Exchange Act Defendants, analysts pressed Defendants for more specifics about the Company's stagnant DAU growth, given Defendants' emphasis on the importance of this user metric in the Registration Statement. For example, Heath Terry, an analyst at Goldman Sachs asked Defendants to "unpack for us a little bit how much of the [DAU] growth came from adding additional users to the platform versus engaging -- increasing engagement on the platform?"

180. However, Spiegel deflected questions about the lack of significant DAU growth. In response, Spiegel stated:

> I think we talk a lot about DAU as an engagement metric. Obviously we provided a couple extra metrics this quarter, like time spent, which is over 30 minutes. And obviously an overall increase in sessions on a per user basis, so those are things we're excited about. And as I mentioned, I think the more

that we can remove friction from this creative process, the more people want to use our service. And that's our strategy.

181.   Spiegel gave a similar non-response to Mark Mahaney, an analyst at RBC Capital Markets, who posed a question about "how to think about DAU growth near-term through the balance of the year."  Spiegel responded:

> I think the way that we try to help people understand how we think about daily active user growth is really through the lens of creativity and creation, because we built our entire business on creation. . . . I think the most important thing to understand is that really we think of this daily active user growth as a function or a derivative of the growth in creation.  And so we're really excited about the momentum there.

182.   During the call, Spiegel sought to reassure investors that despite Snap's disappointing growth in user engagement, Snap's reported DAU results reflected genuine user engagement, and were not the product of "growth hacking" techniques used by other applications to inflate DAU metrics.  Spiegel stated:

> I'd love to speak a little bit to the DAU question, because it's a question that we get all the time. And I think one of the reasons why it's such a popular question is because there's a lot of this thing in our industry called growth hacking, where you send a lot of push notifications to users, or you try to get them to do things that might be unnatural or something like that.
>
> And I think while that's the easy way to grow daily actives quickly, we don't think that those sorts of techniques are very sustainable over the long term. And I think that can ultimately impact our relationship with the customer.
>
> ***
>
> So, ultimately, I think the way that we try to help people understand how we think about daily active user growth is really through the lens of creativity and creation, because we built our entire business on creation

183.   Spiegel's new emphasis on "think[ing] about daily active user growth [] really through the lens of creativity and creation" and assurances that Snap's DAU numbers, while low, reflected genuine engagement, assuaged investor concerns by concealing the fact that without the rapid growth in user engagement promised in the Registration Statement, Snap's ability to monetize its platform and achieve profitability was impossible.

184.   The powerful Wall Street banks that had helped take Snap public echoed

Spiegel's positive statements regarding Snap's user growth and engagement. For example, Morgan Stanley reiterated its position on Snap stock, maintaining its overweight rating and $28 price target. In a May 11, 2017 report, Morgan Stanley stated that "1Q didn't bring the post-IPO rev/DAU beat investors were looking for, but we remain bullish about SNAP's rising engagement and the monetization potential of its user base."

185. Goldman Sachs similarly reiterated its $27 price target on May 11, 2017, stating that Snap's "audience and engagement represent a unique asset that will benefit from growth and diversification of internet usage and advertiser adoption as both mature."

186. Credit Suisse, despite recognizing "a lower trajectory for DAU growth in [rest of world] geographies," reaffirmed its $30 price target in a May 11, 2017 report, stating that "[a]lthough we would certainly have preferred to have seen higher DAUs reported vs. our expectations," the "long-term investment thesis has not changed."

187. On May 24, 2017, Khan repeated the Exchange Act Defendants' false assurances to investors during the Company's presentation at the J.P.Morgan Technology, Media, and Telecom Conference. Khan acknowledged the market's surprise at the Company's 1Q2017 results, stating that "we are very pleased with our Q1 performance. Obviously different people have different expectations."

188. Khan continued to tout the Company's growth in user engagement, stating that "We saw time spent by users on the platform was up sequentially and year-over-year and our average user spent more than 30 minutes on the platform. And so we are very excited by that."

189. Reiterating Spiegel's recent comments, Khan stated unequivocally that the Company did not engage in any "growth hacking" tactics. Khan stated that "I think the other thing is we don't do anything to do growth hacking. We don't spam you all the time to add you as a net user. So our growth is driven by word-of-mouth and new product launches."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.      Third-Party Data Suggests that the Exchange Act Defendants' False Assurances Are Untrue**

190.   On June 7, 2017, it was reported that, based on data from SensorTower, a firm that tracks app analytics, worldwide downloads of Snapchat for the months of April and May 2017 were down 22% from the year prior, confirming that the image of Snap as a rapidly-growing, soon-to-be profitable business presented in the Registration Statement was just a mirage.

191.   A report issued by Nomura Instinet on this date noted that "By comparison, Instagram downloads have demonstrated YoY growth, suggesting that competitive pressures may be intensifying for Snap, challenging the platform's ability to attract and retain new users."  The report concluded with a reduce rating and a $14 price target on Snap, lowering full-year sales and profit estimates for 2017 and 2018.

192.   On this news, Snap's share price fell approximately 7.4%, from a prior close of $20.36 per share on June 6, 2017 to close at $18.85 per share on June 8, 2017.

**G.      Morgan Stanley Downgrades Snap's Stock**

193.   On July 11, 2017, Morgan Stanley downgraded its "Buy" position to "equal-weight" and lowered its price target by 42% to $16, below the IPO valuation.  In support of this about-face, Morgan Stanley bluntly stated: "We have been wrong about SNAP's ability to innovate and improve its ad product this year (improving scalability targeting, measurability, etc.) and user monetization as it works to move beyond 'experimental' ad budgets into larger branded and direct response ad allocations."  Morgan Stanley's "Bear" case proved for a price of only $7.  The report continued that "SNAP's ad product is not evolving/improving as quickly as we expected and Instagram competition is increasing."  The report cited the SensorTower download data, commenting that Morgan Stanley was "lowering [its] forward DAU estimates given this data," which it viewed as a "troubling directional trend[] which causes us to lower our DAU outlook."

194.   On this news, Snap's share price fell $1.52 per share, or approximately 8.9%, from a closing price of $16.99 on July 10, 2017, to close at $15.47 per share on

July 11, 2017.

195.   Morgan Stanley's shocking reversal was noted by market participants as signaling a significant change in the outlook of Snap stock.  For example, Yahoo! Finance reported that "Morgan Stanley's downgrade is a particularly hard hit for the company as the bank was the lead underwriter for Snap's IPO, guiding the company through the process and helping determine its initial stock price."  The report highlighted that Morgan Stanley's downgrade was based on concerns about Snap's ability to grow, and "effectively refuted the main reasons why Snap's biggest champions believed in the company at all: its apparent scalability and unique platform."  Similarly, CNBC described Morgan Stanley's downgrade as "a rare rebuke by a firm that helped bring [Snap] public."

## H.   2Q 2017 Results

196.   On August 10, 2017, after the market closed, Snap reported its financial results for the second quarter of 2017.  In a press release announcing the results, the Company reported that "DAU grew from 143 million in Q2 2016 to 173 million in Q2 2017, an increase of 30.5 million or 21% year-over-year.  DAU increased 7.3 million or 4% quarter-over-quarter, from 166 million in Q1 2017."

197.   In response to Snap's continued disappointing growth in user engagement, Snap's share price declined $1.94 per share, or approximately 14%, from a closing price of $13.77 on August 10, 2017, to close at $11.83 per share on August 11, 2017.

198.   Snap hosted a conference call with analysts and investors after the market closed on August 10, 2017.  During the call, the Exchange Act Defendants repeated their emphasis on the purported quality of Snap's user engagement.  For example, as part of his prepared remarks, Spiegel stated that "the creativity of our community . . . makes Snapchat so unique.  Each one of our daily active users creates over 20 snaps per day, on average, to express themselves and communicate with their friends."

199.   The Exchange Act Defendants also sought to manage expectations about Snap's user growth going forward. Despite the Company never having provided earnings guidance, Vollero stated:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

As we move forward, we wanted to share some thoughts on the balance of 2017. With respect to the seasonal trajectory of the advertising revenue in the prior year, our Q3 2016 results benefited from demand related to the Summer Olympics and elections. Normalizing for those increases, our revenue grew $39 million from Q2 2016 to Q3 2016.

200. During the call, Richard Scott Greenfield, an analyst with BTIG, challenged Snap's reported DAU numbers and much-touted user engagement metrics. With respect to DAU, Greenfield asked:

Evan, on your first investor call and actually Imran just mentioned earlier as well, you have both spoken about how others use growth hacking to inflate DAU and how it really hurts kind of the platform's relationship with users. Yet we definitely, over the past quarter, have begun to see push notifications from Snapchat, essentially alerting us to one of our friends or one of our connections has published a story, would you like to go see it. Wondering despite Imran's comments earlier, has your philosophy on growth hacking begun to change?

With respect to user engagement, Greenfield asked:

[T]ime spent on Snapchat and Instagram based on the recent comments from Instagram seems like it's fairly similar. But there's a very -- my sense is there's very little direct messaging that happens on Instagram, implying that most of their time spent is actually content consumption. When you think about Snapchat's 30 minutes of usage per day, how much of that is actually Stories, including Discover, versus basically communications?

201. In response to the first question, Spiegel initially stated that "we've been sending notification like that for stories for friends since 2014, so I'm not sure why you're just seeing that now." In response to the second question, Spiegel stated that "We don't break out Stories versus communication, but I think the important thing is we've done a very good job innovating around monetizing communication."

202. However, when challenged to provide more insight into what was truly driving the Company's reported DAU and user engagement growth, Spiegel admitted that the Company was using push notifications to "growth hack" and boost the Company's reported user metrics. Greenfield had the following exchange with Spiegel:

**Greenfield**: So maybe just be clear. What exactly is the growth hacking that others do? If you sending push communications is not growth hacking, what are others doing that you consider to be growth hacking and not real DAU growth?

**Spiegel**: Yes. I think there are plenty of examples online, if you want to go for a Google. ***But I think the most important thing for us is that when we're telling you about content on this service that is really highly relevant to you and from your very close friends. And I think people, as they become more reliant on push notifications, have sort of relaxed the standards there, and I think it's important for our business.***

203.   Market commentary attributed Snap's disappointing DAU growth to competition from Facebook, and attributed the decline in Snap's stock price to Snap's disappointing user engagement metrics.  For example, on August 10, 2017, *Fortune* reported that "Snap Inc. reported a lower-than-expected number of daily active users for Snapchat, its popular messaging app, for the second quarter as the company grapples with stiff competition from Facebook . . . sending its shares down about 6% in extended trading."  Similarly, *Business Insider* reported that "The number of daily Snapchat users only increased by 7 million from the first quarter; analysts were expecting that number to go up by 10 million."

204.   Analysts reached the same conclusion.  For example, Morningstar reported on August 10, 2017 that "Snap's second quarter was yet again disappointing," as "the daily average user growth came in below expectations."  The report concluded that "[w]hile Snap is making headway into further monetizing its user base, we still believe lack of robust growth in the firm's overall user base weakens the sustainability of any network effect."

205.   In the wake of Snap's second consecutive quarter failing to deliver on its promises of growing user engagement and the supposed steady stream of new advertisers eager to invest in its platform, market analysts uniformly lowered their price targets, including those associated with the IPO's underwriters.  For example, in an August 11, 2017 report, Credit Suisse lowered its price target from $25 to $17, stating that "Our estimates reset lower in the near-term, as we along with the Street will interpret management's commentary around Olympics and Election-driven accentuated seasonality for 3Q16 as a move to manage expectations."

206.   Barclays, which had previously reduced its price target to $18 from $24 on

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

May 11, 2017 following Snap's 1Q results, lowered its price target an additional 28% to $13 on August 11, 2017, stating that user engagement was proceeding at a "lower pace than direct peers (and Snap's 1H16 cadence)."

207.   J.P.Morgan likewise reduced its price target from $18 to $16, stating that they "remain[ed] Neutral given increased competition from FB and Instagram."

## I.   Post-Class Period Developments

208.   During Snap's third quarter as a public company, additional revelations emerged concerning the false impressions of the Company's user growth and engagement it fostered at the time of its IPO.

209.   As the bottom fell out from Snap's stock, Morgan Stanley lowered its price target again on August 22, 2017, this time to $14.  Once again, Morgan Stanley waited to drop the bombshell until after the Company had reported its disappointing results.  In support of its new valuation, Morgan Stanley concluded that "we believe Snap's core ad product is still lacking the performance (low click-through rates), measurability, and advertising ROI to inflect ad dollar growth. . . . [and] in our view, 2Q results speak to how it may take longer for the ad product (as currently structured) to improve than previously believed."

210.   In a similar move, on September 11, 2017, Deutsche Bank downgraded shares of Snap from Buy to Hold "after mixed ad checks lead us to reduce our 2H estimates and PT to $17 (from $20)."  The report noted that Deutsche Bank was "tak[ing] a more conservative view of DAU growth (4.5M net adds in 3Q) reflecting seasonality."  On September 25, 2017, J.P.Morgan lowered its price target an additional $2 to $14, citing "mixed sentiment from our advertiser checks" and that "Instagram Stories ads continue to gain strong traction relative to Snap Ads given the greater scale of Instagram, and Facebook's ad platform."

211.   On September 25, 2017, *TechCrunch* reported that Instagram had grown to 500 million DAU.  The reported noted that "[d]espite the social network's huge user population, its growth isn't slowing down," and that "time spent by users viewing video

on Instagram is up over 80 percent year over year." The report concluded:

> These stats are encouraging for anyone investing in Instagram as a platform, and for Facebook's larger ambitions. But they're likely discouraging to Snapchat, one of Instagram's main rivals for user attention. Instagram's skyrocketing growth has come as the company copied and implemented a number of Snapchat product experiences, including Stories

212.   On October 2, 2017, eMarketer lowered its full-year revenue expectations for Snap by $127.5 million, or approximately 16.5%, below any of the most bearish estimates by Wall Street analysts. eMarketer cited slower than expected user growth and poor sentiment among advertisers as the basis for its reduction in revenue expectations. Notably, in July 2016, before the launch of Instagram Stories, eMarketer had forecast Snap's 2017 revenue at $805 million. eMarketer concluded that despite being a public company for seven months, Snapchat "remains in the experimental bucket for many marketers," with many advertisers citing poor returns on their ad dollars.

213.   As Snap continued to sputter, Spiegel publicly acknowledged that Snap had failed to effectively communicate with its investors. At a rare public appearance on October 3, 2017 at Vanity Fair's New Establishment Summit in Beverly Hills, Spiegel stated:

> Going public was really the right thing for the company, and certainly the right thing at the time. . . . One of the things I did underestimate was how much more important communication becomes . . . When you go public you need to explain to a huge new investor base . . . how your business works.

214.   Additional details regarding Snap's stagnant growth emerged on October 20, 2017, when it was widely reported that Snap had announced internally that it would slow its hiring rate in 2018. Company insiders revealed that Snap had laid off eighteen employees in its recruiting division. It was also reported that Spiegel had sent an internal email to Snap employees informing them that the Company would slow its hiring rate in 2018 and that managers would be asked to make "hard decisions" in order to reduce the Company's workforce.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

215.   As alleged herein, the Exchange Act Defendants made materially false and

misleading statements and failed to disclose material facts concerning: (i) Snap's user growth and engagement, by minimizing the known adverse impact of competition from Instagram's Stories; (ii) the restatement of Snap's 2015 daily user metrics, by failing to disclose Pompliano's detailed, credible allegations regarding Defendants' knowing misrepresentation of its user engagement metrics and severe internal controls deficiencies; and (iii) falsely asserting that Snap did not employ "growth hacking" strategies to inflate user growth.

216.  In addition to the allegations set forth in Sections V, VI, and VIII, numerous additional facts give rise to a strong inference that, throughout the Class Period, the Exchange Act Defendants knew or recklessly disregarded that their statements were materially false and misleading when made.

217.  The Executive Defendants, by virtue of their positions with Snap, were responsible for, and remained well informed of, issues critical to the Company's success. As Snap stated in the Registration Statement, "we view Daily Active Users as a critical measure of our user engagement. Adding, maintaining, and engaging Daily Active Users have been and will continue to be necessary." Snap's user engagement metrics were therefore critical to the Company's core operations.

218.  As would be revealed after the IPO, Facebook's strategy of replicating Snapchat's most popular features on its Instagram platform had an immediate and dramatic impact on Snapchat's user growth and engagement.

219.  The Executive Defendants would have had direct evidence of the impact on Snap's user growth and engagement following the introduction of Instagram's Stories feature. These issues were specifically raised with the Executive Defendants prior to the IPO in numerous contexts including in the form of a company-wide town hall in which Defendant Spiegel was confronted with widespread sentiment from Snap's sales team about challenges competing with Instagram. Spiegel reportedly dismissed the concerns of his subordinates.

220.  Former employees confirm that, prior to the IPO, Snap senior management

prepared a company-wide memorandum on the topic of Instagram's competition with Facebook which former employees have characterized as "cocky" and "dismissive" of the concerns that employees and advertisers had expressed.

221. Moreover, the Exchange Act Defendants' own statements confirm that they paid particularly close attention to Snap's user engagement metrics while simultaneously minimizing the significance of Snap's slowing user growth. For example, during the IPO roadshow, Spiegel reportedly brushed aside concerns of slowing user growth while touting the strength of Snap's user engagement.

222. Therefore, Defendants' positive statements regarding Snap's user growth and engagement and explanations for the decline in Snap's user growth prior to the IPO were knowingly false when made.

223. Defendants' knowledge of the falsity of their statements regarding Snap's purportedly authentic user growth and engagement can be inferred from the fact that soon after Defendants made these statements, the Company reversed course and disclosed that the Company's disappointing DAU numbers were in fact partly inflated by "growth hacking" techniques. During the May 10, 2017 conference call, Spiegel represented that the Company was "really excited about the momentum" with its DAU growth, and represented that the Company's user growth was "a function or a derivative of the growth in creation" and not the product of "growth hacking, where you send a lot of push notifications to users or you try to get them to do things that might be unnatural or something like that." Similarly, on May 24, 2017, Khan represented that "we don't do anything to do growth hacking."

224. However, Spiegel admitted on August 10, 2017 that a portion of Snap's DAU growth was in fact driven by increasing use of push notifications to get users to use the Snapchat application, stating that "as [people] become more reliant on push notifications, have sort of relaxed the standards there, and I think it's important for our business."

225. With respect to Defendants' failure to disclose Pompliano's allegations,

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

Defendants' knowledge of Pompliano's allegations can be inferred the fact that Snap was named as a defendant in Pompliano's California complaint, filed before the IPO, in which Pompliano alleges that he personally informed Spiegel and Khan of the results of his investigation into the unreliability of Snap's user engagement metrics and its lack of internal controls over user engagement data.  Moreover, Pompliano alleges that Vollero admitted to him that the metrics Snapchat had been using were wrong, and that the Company's representations were inaccurate and should be corrected.  As Pompliano alleges, as a result of presenting these results and insisting that Snap stop misrepresenting its user metrics, Snap executives conspired to have him unjustly terminated, confirming Defendants' knowledge of his allegations.

226.   Defendants' knowledge of the materiality of Pompliano's allegations can also be inferred from the fact that, despite denying Pompliano's allegations prior to the IPO, stating that they "ha[d] no merit" and were "totally made up by a disgruntled former employee," the Registration Statement corroborated one of Pompliano's core allegations, not publicly available at the time of the IPO: Snap had been forced to restate its historical DAU numbers due to its reliance on third party measurement applications it knew to be false.  As the Company disclosed in the Registration Statement that "Substantially all of [Snap's] revenue comes from advertising" and "*real or perceived inaccuracies* in [user engagement] metrics may seriously harm and negatively affect our reputation and our business" due to changes in "advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat."

227.   The fact that the Registration Statement specifically disclosed two immaterial lawsuits, including a dismissed personal injury lawsuit, in its discussion of "Pending Matters" highlights the materiality of the Exchange Act Defendants' knowing omission of Pompliano's allegations.

228.   Finally, Spiegel and Murphy had the motive and opportunity to engage in the wrongful conduct described herein, as evidenced by the fact that Spiegel and Murphy each sold 16 million shares in the IPO, generating each Defendant $272 million in

proceeds.

## VIII. EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

229.   As alleged herein, the Exchange Act Defendants issued three categories of false and misleading statements and omissions of material fact during the Class Period. In the Registration Statement, the Exchange Act Defendants made materially false and misleading statements concerning Snap's user growth and engagement by minimizing the known adverse impact that Instagram's clone Stories function was having on Snap's user growth and engagement.   Second, the Exchange Act Defendants made materially false and misleading statements concerning the restatement of its 2015 daily user metrics by failing to disclose Pompliano's detailed, credible allegations regarding Defendants' knowing misrepresentation of its user engagement metrics and severe internal controls deficiencies.   Additionally, the Exchange Act Defendants violated ASC 450 by failing to disclose the Pompliano complaint and describing the nature of his claims.   Third, following the IPO, Defendants misled investors regarding their user engagement by falsely asserting that Snap did not employ "growth hacking" strategies to drive user growth.

### A.   Snap's Registration Statement

#### 1.   The Registration Statement Contained Materially False and Misleading Statements Regarding Snap's User Growth and Engagement

230.   The single most important metric that Snap's Registration Statement touted was its daily active users and the trends associated with this metric.   The following chart appeared on page 72 of the Registration Statement:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS



231.   With regard to the trends relating to DAU, Snap disclosed that "[t]he rate of net additional Daily Active Users was relatively flat in the early part of the quarter ended December 31, 2016" but also claimed that this flatness could be attributed to the fact the Company *"historically experienced lumpiness in the growth of our Daily Active Users."* Snap also noted that DAU growth *"accelerated in the month of December."*

232.   The Registration Statement attributed the relatively flat DAU growth in the 4Q 2016 as being "*primarily related to accelerated growth in user engagement earlier in the year."*

233.   According to the Registration Statement: "The rate of net additional Daily Active Users accelerated in the first half of 2016 compared to the second half of 2015, largely due to increased user engagement from product launches and increased adoption rates among older demographics."  Snap explained that "[t]his created a *higher baseline of Daily Active Users* heading into the third and fourth quarters*, so incremental net additions within these quarters were more difficult even with strong year-over-year growth."*

234.   The only disclosure that Snap made regarding any impact from Facebook's

Instagram was the following: "Instagram, a subsidiary of Facebook, recently introduced a 'stories' feature that largely mimics our Stories feature and ***may be directly competitive.***" In effect, the Registration Statement operated as a direct rebuttal of any speculation that Facebook's Instagram was having a negative impact on Snap's DAU and user engagement.

235.   The statements in ¶¶230-34 were materially false and misleading when made because the Exchange Act Defendants misrepresented and failed to disclose the following:

a.   Instagram's launch of its clone "Stories" function had resulted in a dramatic decline in Snap's user growth. As reflected in a chart of Instagram's growth compared to Snapchat's following the launch of Stories on Instagram, Snap's flat growth coincided with an exponential growth in its chief competitor's popularity:



b.   Snap's senior management was directly informed by the Company's sales staff that Snap was losing advertisers to Instagram and Snap was losing market share. According to FE 1, in response to widespread concern raised by Snap's employees, Snap distributed a company-wide memo addressing Instagram's growth relative to Snap that attempted to deflect widespread

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

1    fears among Snap employees about Instagram's impact.

2    c.    FE 2 revealed that in January 2017, Snap held a company-wide meeting
3          during which numerous employees expressed concerns to Spiegel and other
4          Snap senior executives about Snap's ability to compete with Instagram.  FE
5          2 described Spiegel's response as dismissive, telling employees to simply
6          execute on Snap's business plans despite competition.   However, FE 2
7          revealed Snap's advertising customers consistently expressed concerns
8          about the value of investing in Snap as compared to Facebook or Instagram,
9          and that the introduction of competing features on Instagram, such as
10         Stories, only amplified these concerns.  As a result of such concerns, FE 2
11         revealed that Snap's internal projections and assumptions about their ability
12         to grow and monetize their platform lacked a reasonable basis.

13   d.    Confirming these witness accounts, an August 2017 report revealed that at
14         the time of the IPO, there was widespread anxiety within the Company about
15         its ability to continue to add new users in the face of competition with
16         Instagram.  The report described a rare Q&A session with Spiegel in which
17         Spiegel received a dozen questions about the impact of competition from
18         Instagram on Snap's user growth.  In response, Spiegel reportedly dismissed
19         the concerns of his employees.

20   236.   Snap's statements in the IPO had the intended effect of discounting any
21   speculation about the potential impact of competition by Instagram and created a
22   materially false impression that Snap's historical growth rate in active users was not
23   being directly impacted by competition from Instagram.

24   237.   For example, in reporting on the Registration Statement, *Business Insider*
25   noted Snap's explanation for the slowdown in user growth as not being the product of
26   competition from Facebook: "[The Registration Statement] says the slowdown in user
27   growth it suffered in the second half of 2016 is because of bad product updates — and
28   not necessarily an increase in competition."

238.   Moreover, several of the major Wall Street investment banks that underwrote Snap's IPO issued analyst reports with target prices well in excess of the IPO valuation based on the information disclosed in the Registration Statement.  In support of these valuations, these analysts cited to the Company's false assurances regarding their competition.  For example, on March 27, 2017, Deutsche Bank initiated coverage with a "Buy" recommendation, setting a $30 price target, noting that "several key investor concerns" such as the Company's current lack of profitability and the threat of competition, were "overblown."

## 2.   The Registration Statement Contained Materially False and Misleading Statements about Snap's Restatement of Its DAU Numbers and the Risk of Inaccurate User Metrics

239.   Snap's failure to disclose Pompliano's detailed, credible allegations regarding the unreliable nature of Snap's user engagement metrics rendered their disclosures regarding the restatement of Snap's historical DAU numbers and the risk of inaccurate user metrics incomplete and misleading.  Snap's omission of Pompliano's allegations and the ongoing controversy surrounding the reliability of Snap's user engagement metrics rendered their discussion of the risks posed to Snap due to a change in advertisers' perception of the business materially misleading.  Regardless of the veracity of Pompliano's claims, even the prospect of his credible allegations leaking out posed a material threat to Snap's fledgling advertising business.

240.   Indeed, the Registration Statement emphasized the importance of the reliability of Snap's user metrics, stating that ***"real or perceived inaccuracies*** in [user] metrics may seriously harm and negatively affect our reputation and our business."  Snap warned investors:

> If advertisers, partners, or investors do not perceive our user, geographic, or other demographic metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user, geographic, or other demographic metrics, our reputation may be seriously harmed.

241.   Despite acknowledging the material risk posed by perceived inaccuracies in

the reliability of Snap's user metrics, the full extent of the Company's disclosures as it related to the historical reliability of its user metrics was limited to the following:

> In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate. For example, before June 2015, we used a third party that counted a Daily Active User when the application was opened or a notification was received via the application on any device. We now use an analytics platform that we developed and operate and we count a Daily Active User only when a user opens the application and only once per user per day. We believe this methodology more accurately measures our user engagement. Additionally, to align our pre-June 2015 Daily Active Users with this new methodology, we reduced our pre-June 2015 Daily Active Users by 4.8%, the amount by which we estimated the data generated by the third party was overstated. Since this adjustment is an estimate, the actual pre-June 2015 Daily Active Users may be higher or lower than our reported numbers. As a result, our metrics may not be comparable to prior periods.

242. As commentators noted when Pompliano's allegations were revealed to the market, the Registration Statement corroborated one of Pompliano's core allegations: Snap had been forced to restate its historical DAU numbers due to its reliance on third party measurement applications it knew to be false. For example, on April 13, 2017, *Fortune* magazine reported that "investors have reason to pay attention" because, despite the Company's claims that it had nothing to hide, "the unsealed lawsuit contains some key statistics that Snapchat has never before disclosed, not even to investors." The article noted that while Snap contended that Pompliano was "'fired for poor performance,' he was right about one important thing: Around the time Snap began selling ads on the platform, Snapchat was not as popular as most people thought it was." The article continued that "Snap does not dispute is that the discrepancy underlying Pompliano's argument actually existed." The article concluded that ***"[f]or investors, though, whether or not Snap exaggerated the user number matters less at this point than the fact that Pompliano's lower number turned out to be right."***

243. Therefore, Snap's failure to fully disclose Pompliano's allegations and the reason for the restatement of Snap's 2015 DAU numbers constituted a material omission that rendered the Registration Statement materially misleading. The Registration Statement's description of the risks to the Company's advertising business from real or

perceived inaccuracies in user metrics as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading impression of the specific risks facing the Company, thereby rendering the foregoing purported risks a then-concealed reality.

### 3. The Registration Statement Failed to Disclose Pompliano's Allegations That Snap's User Metrics Were Unreliable, a Material Omission and Violation of ASC 450

244.   The Registration Statement's failure to disclose the fact of Pompliano's whistleblower suit and its allegations relating to the accuracy and integrity of Snap's user metrics was a material omission.  The Registration Statement emphasized the importance of lawsuits to the Company by disclosing to potential investors that "[f]rom time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming.  If resolved adversely, lawsuits and other litigation matters could seriously harm our business."  In particular, the Registration Statement explained:

> Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and accordingly our business could be seriously harmed. Although the results of lawsuits and claims cannot be predicted with certainty, we do not believe that the final outcome of those matters that we currently face will seriously harm our business.

245.   Highlighting the significance of lawsuits to the Company, the Registration Statement specifically disclosed in a section of the Registration Statement titled, "Pending Matters," two lawsuits.  The first disclosed lawsuit was brought in September 2015 and involved a claim that the defendants improperly used the plaintiff's image.  The second was a personal injury lawsuit filed in April 2016 which had been dismissed. Despite these disclosures, the Registration Statement failed to disclose the existence and substance of Pompliano's claims against the Company—which, at the time of the IPO, had been filed under seal.

246.   As set forth above, Pompliano's complaint alleged a systemic failure in Snapchat's internal controls and computation of critical user metrics, and alleged that

these problems persisted until the IPO.  More specifically, Pompliano claimed that Snap's user data was unreliable and inaccurate, and claimed that Snap had misled advertisers and investors.

247.  Undisclosed to investors, the Registration Statement *confirmed* one of Pompliano's core allegations.  This fact would only be revealed ***after*** the IPO, when it was reported that, despite the Company's claims that Pompliano's allegation "ha[d] no merit" and were "totally made up," the Registration Statement confirmed that due to unreliable measurements, Snap had been forced to restate its historical user metric data.

248.  Given the material risk posed by "***real or perceived inaccuracies in [user] metrics,***" which the Registration Statement admitted "may seriously harm and negatively affect [Snap's] reputation and [] business," Defendants had a duty to disclose Pompliano's action and the nature of his claims under General Accepted Accounting Principles ("GAAP").  Specifically, under Accounting Standards Codification Topic 450 ("ASC 450"), which governs the disclosure and accrual of contingencies by public companies in their periodic reports and registration statements filed with the SEC, if the likelihood of a material loss is "reasonably possible," i.e., more likely than remote, but less likely than probable, and the amount of the reasonably possible loss is estimable, then a company must disclose the nature of the contingency and also provide its estimate of the amount or range of loss.  If the reasonably possible loss is not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

249.  ASC 450-20 provides examples of loss contingencies covered by ASC 450 and, as pertinent here, specifically includes "litigation, claims, and assessments."  At minimum, ASC 450-20-55-13 provides that a loss contingency involving a filed claim must be disclosed if there is a reasonable possibility that the outcome will be unfavorable.  Thus, in cases where the filed claim has not yet been resolved, but an unfavorable outcome is reasonably possible, ASC 450 requires an issuer to disclose the nature of the contingency and any amount of loss that is reasonably possible.  ASC-450-20-55-31.

Here, in failing to disclose the Pompliano lawsuit and the nature of the claims, Snap violated ASC-450.

250.   Under ASC 450, Snap's failure to disclose Pompliano's complaint in its discussion of litigation-related risks facing the Company was a material omission.  Given that, according to the Registration Statement, "***real or perceived inaccuracies*** in [Snap's user] metrics may seriously harm and negatively affect our reputation and our business," Pompliano's allegations posed a risk of material loss that was at least reasonably probable, regardless of whether Snap disputed Pompliano's claims.

251.   Moreover, California Labor Code § 1054, pursuant to which Pompliano brought his initial complaint, provides for treble damages.  In addition to such damages, Pompliano sought punitive damages for his alleged wrongful termination.  Given that at the time of IPO, Snap was losing money, the likelihood of a material loss as a result of his complaint was "reasonably possible."   Therefore, the Exchange Act Defendants violated ASC 450 by failing to disclose the fact of Pompliano's complaint.

## B.   May 10, 2017 Conference Call

252.   On May 10, 2017, after the Company reported disappointing DAU growth of only 5% quarter-over-quarter, Defendants falsely assured investors that despite disappointing quarterly results, Snap's user engagement was steadily growing.   For example, during a conference call with analysts and investors on this date, Spiegel stated that during the first quarter, Snap saw a "significant increase in engagement, with now over 3 billion Snaps created every day with our cameras, generating an increase in overall sessions and time spent."  Similarly, Khan touted the purported fact that "time spent for our users continues to grow," claiming that "On average, in Q1 our users spent over 30 minutes per day on Snapchat."

253.   In an effort to distract investors from Snap's disappointing DAU numbers, Spiegel attempted to redefine the Company's much-touted DAU number, claiming that the Company was more focused on the quality of user engagement than on absolute growth in users:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

I think the way that we try to help people understand how we think about daily active user growth is really through the lens of creativity and creation, because we built our entire business on creation. . . . I think the most important thing to understand is that really we think of this daily active user growth as a function or a derivative of the growth in creation. And so we're really excited about the momentum there.

254.   Moreover, Spiegel sought to reassure investors by dispelling any concern that Snap's reported DAU numbers were inflated by so-called "growth hacking" techniques used by other applications, and reflected only genuine engagement:

I'd love to speak a little bit to the DAU question, because it's a question that we get all the time. And I think one of the reasons why it's such a popular question is because there's a lot of this thing in our industry called growth hacking, where you send a lot of push notifications to users or you try to get them to do things that might be unnatural or something like that.

And I think while that's the easy way to grow daily actives quickly, we don't think that those sorts of techniques are very sustainable over the long term. And I think that can ultimately impact our relationship with the customer.

255.   The statements in ¶¶252-55 were materially false and misleading when made because for the reasons set forth in ¶235 above, the Exchange Act Defendants knew, but failed to disclose the fact that Snapchat had experienced a dramatic decline in user growth and engagement due to the launch of Instagram's clone Stories, which mimicked Snapchat's most popular features and was therefore directly competitive.  The adverse trend on Snap's user growth and engagement caused by Instagram's Stories was ongoing at the time the Exchange Act Defendants made the foregoing false and misleading statements.

256.   In addition, the Exchange Act Defendants' statements claiming that Snap's DAU numbers were not inflated through "growth hacking" techniques were false and misleading because, as Spiegel admitted on August 10, 2017, a portion of Snap's DAU growth was driven by increasing use of push notifications to get users to use the Snapchat application.  Spiegel defended Snap's practice by stating that "as [people] become more reliant on push notifications, have sort of relaxed the standards there, and I think it's important for our business."

257.   The Exchange Act Defendants' false assurances regarding Snap's user

growth and engagement had the intended effect, as reflected in market commentary following the May 10, 2017 conference call. For example, Morgan Stanley noted that "1Q didn't bring the post-IPO rev/DAU beat investors were looking for, but we remain bullish about SNAP's rising engagement and the monetization potential of its user base. We are buyers on weakness." Similarly, S&P Global projected "significant growth opportunities as SNAP focuses on expansion and monetization, and we think the company is poised to take notable market share in global mobile advertising." With respect to the threat of competition, S&P reiterated the Registration Statements qualified risk disclosure, noting that Facebook had "developed offerings/features similar to SNAP's, *perhaps* detracting from user/ engagement/revenue growth."

## C.    May 24, 2017 J.P.Morgan Conference

258.    On May 24, 2017, Khan repeated the Exchange Act Defendants' false assurances regarding the strength of Snap's user growth and engagement to investors during the Company's presentation at the J.P.Morgan Technology, Media, and Telecom Conference.

259.    As part of his prepared remarks, Khan touted the Company's growth in user engagement, stating that "We saw time spent by users on the platform was up sequentially and year-over-year and our average user spent more than 30 minutes on the platform."

260.    Reiterating Spiegel's false representations about the quality of Snap's user engagement, Khan stated unequivocally that the Company did not engage in any "growth hacking" tactics. Khan stated that "I think the other thing is we don't do anything to do growth hacking. We don't spam you all the time to add you as a net user. So our growth is driven by word-of-mouth and new product launches."

261.    The statements in ¶¶259-60 were materially false and misleading when made for the reasons set forth in ¶235 above, the Exchange Act Defendants knew, but failed to disclose the fact that Snapchat had experienced a dramatic decline in user growth and engagement due to the launch of Instagram's clone Stories, which mimicked Snapchat's most popular features and was therefore directly competitive. The adverse

trend on Snap's user growth and engagement caused by Instagram's Stories was ongoing at the time the Exchange Act Defendants made the foregoing false and misleading statements.

262.   In addition, Defendants statements claiming that Snap's DAU numbers were not inflated through "growth hacking" techniques were false and misleading because, as Spiegel admitted on August 10, 2017, a portion of Snap's DAU growth was driven by the increasing use of push notifications to get users to use the Snapchat application. Spiegel defended Snap's practice by stating that "as [people] become more reliant on push notifications, have sort of relaxed the standards there, and I think it's important for our business."

263.   Following the Company's statements touting its user growth and the purported authenticity of its reported DAU numbers, J.P.Morgan reported on May 24, 2017 that user engagement was one of the "Key Takeaways" from Khan's presentation, noting that "Snap highlighted the continued strong engagement seen in 1Q" and that "North America, where Snap is highly focused, continues to be strong."

## IX.   LOSS CAUSATION

264.   As alleged herein, Defendants engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning: (i) Snap's user growth and engagement, by minimizing the known adverse impact of competition from Instagram's Stories; (ii) Pompliano's complaint and the nature of his allegations, including that his complaint alleged the need to restate of Snap's 2015 DAU metrics; and (iii) falsely asserting that Snap did not employ "growth hacking" strategies to inflate user growth.   Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section VIII, caused the price of Snap common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of Snap common stock.

265.   Relying upon the integrity of the market price for Snap common stock and

public information relating to the Company, Plaintiffs and other Class members purchased or otherwise acquired Snap common stock at prices that incorporated and reflected the Exchange Act Defendants' misrepresentations and omissions of material fact alleged herein.  Had the Exchange Act Defendants been truthful about these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired their Snap common stock at the artificially inflated prices at which it traded.

266.   Plaintiffs and other Class members suffered actual economic loss and were damaged when the trading price of Snap common stock declined upon the public disclosure of new information correcting the Exchange Act Defendants' alleged misrepresentations regarding Snap's user growth and engagement, Pompliano's allegations regarding the Exchange Act Defendants' knowing misrepresentation of Snap's user engagement metrics, and the Exchange Act Defendants' use of  "growth hacking" to inflate Snap's user engagement metrics.  These revelations occurred through at least five partial corrective disclosures:  April 4, 2017, May 10, 2017, June 7-8, 2017, July 11, 2017, and August 10, 2017.

267.   As alleged above in ¶¶137-207 and in this Section, these partial corrective disclosures of the Exchange Act Defendants' fraud caused foreseeable declines in the price of Snap common stock by removing portions of the artificial inflation in the price of Snap common stock that resulted from the Exchange Act Defendants' fraud.  The timing and magnitude of the declines in the price of Snap common stock in response to the public disclosure of new, Company-specific news on each of the days alleged herein negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to the Exchange Act Defendants' fraud.

268.   As alleged in ¶¶163-69 above, on April 4, 2017, new details concerning Pompliano's allegations against Snap emerged.  On this date, it was reported by *Business Insider* that "[c]urrently redacted portions of Pompliano's lawsuit contain user metrics

that he claims are different from what Snap told investors and the press ahead of its February IPO." This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by the Exchange Act Defendants' prior misstatements and omissions regarding Snap's internal controls over user engagement data. Furthermore, this partial disclosure was a foreseeable consequence of the Exchange Act Defendants' omissions of material facts concerning Pompliano's allegations and the resultant risk that advertisers would perceive Snap's user engagement metrics as unreliable.

269. As a direct and proximate result of this partial corrective disclosure of Defendants' fraud, the price of Snap's common stock fell approximately 7.3%, from a close of $22.35 per share on April 3, 2017 to close at $20.70 per share on April 5, 2017, on heavy trading volume, thereby removing a portion of the artificial inflation in the price of Snap common stock.

270. Market commentators specifically attributed the subsequent decline in Snap's stock to the revelation of this news. For example, citing Pompliano's allegations that "Snap's outsized valuation is built on a house of cards" that has been "systematically built through a coordinated effort from Snap's executives to personally reward themselves with billions of dollars by maliciously manipulating metrics, suppressing metrics that put the company in a negative light, and even, at times, blatantly misleading professional investors, employees, advertisers, and now, retail investors," *Business Insider* reported on April 5, 2017 that "Snapchat's stock price is diving on Wednesday, down 4.29%.

271. As alleged in ¶¶170-74 above, on May 10, 2017, Snap announced that its DAUs increased only 5% quarter-over-quarter, from 158 million in Q4 2016. The disclosure of Snap's disappointing user growth and engagement was a foreseeable consequence of Defendants' misrepresentations and omissions of material facts concerning Snap's user growth and engagement and the competition it faced from Instagram. This disclosure partially (but incompletely) revealed some of the relevant

truth concealed and/or obscured by Defendants' prior misstatements and omissions, which created the false impression that Snap expected its user growth to continue unabated and that the risk of Instagram's clone features directly competing against Snap was a hypothetical risk rather than a concealed reality.

272.   As a direct and proximate result of this partial corrective disclosure of the Exchange Act Defendants' fraud, the price of Snap's common stock fell $4.93 per share, or approximately 21%, from a closing price of $22.98 on May 10, 2017, to close at $18.05 per share on May 11, 2017

273.   As was widely reported at the time, analysts attributed the stock price decline on this date to Snap's disappointing DAU growth, as reflected in numerous analyst reports:

   a.   Morningstar reported on May 10, 2017 that "growth in daily average users, or DAUs, was disappointing."

   b.   Piper Jaffray reported that Snap's "user growth and ad load ramp [was] underwhelming given the company's valuation" and that "[l]acking DAU and revenue upside in the first quarter as a public company means SNAP is now firmly in the penalty box."

   c.   Canaccord reported that "DAU growth decelerated again to 36%, a far cry from the 63% growth seen in Q3, and although this was roughly in line with our estimate, it is likely the primary reason for the stock's volatility after the earnings report."

   d.   William Blair reported that "Average daily active users (DAUs) of 166 million were about 1.3 million below the Street estimate."  The report noted that "most investors were focused on the company's DAUs metric heading into the print with concerns about how competition from Facebook."

   e.   Barclays reported that the "biggest issue was the lack of any meaningful pick up in ROW DAU net adds."

f. Credit Suisse reported that "We expect the positive aspects of SNAP's 1Q17 report (North America monetization, hosting cost leverage) to be overshadowed by the revenue and DAU miss, as this was certainly NOT in the script for its first report as a public company."

274. The views of analysts were echoed in other market commentary. For example, *TechCrunch* reported on May 10, 2017, "Snap's growth rate increased just a little in Q1 2017 – a bad start to its first quarterly earnings report since going public." Market commentators uniformly attributed Snap's slowing user growth to direct competition from Instagram. For example, *VentureBeat* reported on May 10, 2017 that "Facebook's plan worked: Snapchat hits 166 million users, 34 million fewer than Instagram Stories."

275. As alleged in ¶¶190-92 above, on June 7, 2017, it was reported that based on data from SensorTower, a firm that tracks app analytics, worldwide downloads of Snapchat for the months of April and May 2017 were down 22% from the year prior, confirming that the image of Snap as a rapidly-growing, soon-to-be profitable business presented in the Registration Statement was just a mirage. A report issued by Nomura Instinet on this date noted that "By comparison, Instagram downloads have demonstrated YoY growth, suggesting that competitive pressures may be intensifying for Snap, challenging the platform's ability to attract and retain new users." As a direct and proximate result of this partial corrective disclosure of Defendants' fraud, the price of Snap's common stock fell approximately 7.4%, from a prior close of $20.36 per share on June 6, 2017 to close at $18.85 per share on June 8, 2017.

276. The revelation of the rapid decline in downloads of Snapchat was a foreseeable consequence of the Exchange Act Defendants' misrepresentations and omissions of material facts concerning Snap's user growth and engagement. This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by the Exchange Act Defendants' prior misstatements and omissions, which created the false impression that Snap expected its user growth to continue

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

unabated and that the risk of Instagram's clone features directly competing against Snap was a hypothetical risk rather than a concealed reality.

277. As alleged in ¶¶193-95 above, on July 11, 2017, Morgan Stanley lowered its price target by 42% to $16 and downgraded Snap to equal-weight. The report specifically tied its downgrade of Snap's stock to the fact that "Instagram competition is increasing." The report stated that Morgan Stanley was "lowering [its] forward DAU estimates given this data," which it viewed as a "troubling directional trend[] which causes us to lower our DAU outlook."

278. Morgan Stanley's shocking downgrade was noted by market participants as signaling a significant change in the outlook of Snap stock. For example, Yahoo! Finance reported that "Morgan Stanley's downgrade is a particularly hard hit for the company as the bank was the lead underwriter for Snap's IPO, guiding the company through the process and helping determine its initial stock price." The report highlighted that Morgan Stanley's downgrade was based on concerns about Snap's ability to grow, and "effectively refuted the main reasons why Snap's biggest champions believed in the company at all: its apparent scalability and unique platform." Similarly, CNBC described Morgan Stanley's downgrade as "a rare rebuke by a firm that helped bring [Snap] public."

279. Morgan Stanley's downgrade was a foreseeable consequence of Defendants' misrepresentations and omissions of material facts concerning Snap's user growth and engagement. This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by the Exchange Act Defendants' prior misstatements and omissions, which created the false impression that Snap expected its user growth to continue unabated and that the risk of Instagram's clone features directly competing against Snap was a hypothetical risk rather than a concealed reality.

280. As a direct and proximate result of this partial corrective disclosure of the Exchange Act Defendants' fraud, the price of Snap's common stock fell $1.52 per share, or approximately 8.9%, from a closing price of $16.99 on July 10, 2017, to close at $15.47 per share on July 11, 2017.

281.   As further evidence that the decline in Snap's stock price was proximately caused by the disclosure of new information regarding the impact of Instagram's directly competitive features on Snap's user growth and engagement—a fact that was known, but fraudulently concealed by the Exchange Act Defendants, *TechCrunch* reported on August 2, 2017 that "If Facebook's goal was stop Snap in its tracks, it's largely succeeded with Instagram Stories.  Snapchat's monthly active user growth rate has plummeted from 17.2% per quarter to just 5%, while Snap's share price has fallen from its $17 IPO to $13."

282.   As alleged in ¶¶196-207 above, on August 10, 2017, Snap reported its financial results for the second quarter of 2017, which included DAU growth of only 4% quarter-over-quarter, from 166 million in Q1 2017.   The disclosure of a second consecutive quarter of Snap's disappointing user growth and engagement was a foreseeable consequence of the Exchange Act Defendants' misrepresentations and omissions of material facts concerning Snap's user growth and engagement.   This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions, which created the false impression that Snap expected its user growth to continue unabated and that the risk of Instagram's clone features directly competing against Snap was a hypothetical risk rather than a concealed reality.

283.   As a direct and proximate result of this corrective disclosure of Defendants' fraud, Snap's share price declined $1.94 per share, or approximately 14%, from a closing price of $13.77 on August 10, 2017, to close at $11.83 per share on August 11, 2017.

284.  Analysts again attributed the decline to Snap's disappointing user engagement metrics:

    a.  Morningstar reported that "Snap's second quarter was yet again disappointing," as "the daily average user growth came in below expectations."   The report concluded that "[w]hile Snap is making headway into further monetizing its user base, we still believe lack of robust growth in the firm's overall user base weakens the sustainability

of any network effect."

b. Canaccord reported that "SNAP's Q2 results were generally below consensus, with slowing DAU growth and lower monetization than expected. DAU growth continues to be strongest in North America, further illustrating the company's international competitive obstacles."

c. Piper Jaffray reported that "Snap reported weak revenue and mixed engagement," noting that "DAUs continue to be the most important indicator of SNAP's future, not just because it is a metric the Street likes, but because it drives the dominating narrative told to advertisers and agencies." The report continued that "Snap is clearly losing market share to Instagram despite being 1/3rd of its size and has established a weakening narrative that extends outside of the Street to advertisers who are deciding where to allocate ad spend." The report concluded that the analysts "remain skeptical of Snap's longevity, as the company lacks meaningful innovation in the face of significant competitive pressure."

285.   The economic losses, i.e., damages, suffered by Plaintiffs and other Class members are direct and foreseeable results of: (i) the Exchange Act Defendants' materially false or misleading statements and omissions of material fact, which caused the price of Snap common stock to be artificially inflated; and (ii) the subsequent significant decline in the price of Snap common stock when the truth was gradually revealed on April 4, May 10, June 7-8, July 11, and August 10, 2017, removing portions of the artificial inflation from the price of Snap common stock.

## X.   PRESUMPTION OF RELIANCE

286.   In support of Plaintiffs' claims under the Exchange Act, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine to establish reliance for the Exchange Act Defendants' false and misleading statements alleged above in ¶¶230-60.  Plaintiffs' reliance may be presumed because, among other things:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

a. The Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in an efficient market;

d. The alleged misrepresentations would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiffs and other members of the Class purchased Snap common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

287. At all relevant times, the market for Snap common stock was efficient for the following reasons, among others:

a. Throughout the Class Period, Snap common stock was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b. Throughout the Class Period, over a dozen different firms and dozens of analysts covered Snap common stock;

c. As a regulated issuer, Snap filed periodic public reports with the SEC; and

d. Snap regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

288. In addition, with respect to the material omissions alleged above in ¶¶244-51, Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose the fact of Pompliano's whistleblower suit and its allegations relating

to the accuracy and integrity of Snap's user metrics. Defendants had a duty to disclose this information under ASC 450, but made no such disclosure.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

289. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

290. None of the statements complained of herein was a forward-looking statement. Rather, each was historical statements or a statement of purportedly current facts and conditions at the time such statement was made.

291. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

292. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Snap who actually knew that such statement was false when made.

293. Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

# XII.  CAUSES OF ACTION UNDER THE EXCHANGE ACT

## A.  COUNT I: For Violation of §10(b) of the Exchange Act and Rule 10b-5 against the Exchange Act Defendants

294.  Plaintiffs incorporate ¶¶1-293 by reference.

295.  During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, thereby violating §10(b) of the Exchange Act and Rule 10b-5.

296.  Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snap stock.  Plaintiffs and the Class would not have purchased Snap stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.  Plaintiffs and other Class members suffered actual economic loss and were damaged when the trading price of Snap common stock declined upon the public disclosure of new information correcting the Exchange Act Defendants' misrepresentations regarding Snap's user growth and engagement, Pompliano's allegations regarding the Exchange Act Defendants' knowing misrepresentation of Snap's user engagement metrics, and Defendants' use of "growth hacking" to inflate Snap's user engagement metrics.  These revelations occurred through at least five partial corrective disclosures on:  April 4, 2017, May 10, 2017, June 7-8, 2017, July 11, 2017, and August 10, 2017.

## B.  COUNT II: For Violation of §20(a) of the Exchange Act against the Executive Defendants

297.  Plaintiffs incorporate ¶¶1-293 by reference.

298.  During their tenures as officers of Snap, the Executive Defendants were controlling persons of Snap within the meaning of §20(a) of the Exchange Act.

299.   By reason of their positions of control and authority as officers and/or directors of Snap, the Executive Defendants had the power and authority to cause Snap to engage in the conduct complained of herein.  The Executive Defendants were able to, and did, control, directly and indirectly, the decision-making of Snap, including the content and dissemination of Snap's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

300.   In their capacities as senior corporate officers and/or directors of Snap, and as more fully described herein, the Executive Defendants participated in the misstatements and omissions set forth above. Indeed, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Snap's user engagement metrics.  The Executive Defendants had the ability to influence and direct and did so influence and direct the activities of the Company and its employees in their violations of §10(b) of the Exchange Act and Rule 10b-5.

301.   As a result, the Executive Defendants, individually and as a group, were control persons within the meaning of §20(a) of the Exchange Act.

302.   As set forth above, Snap violated §10(b) of the Exchange Act.  By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78(a), jointly and severally with, and to the same extent as Snap is liable to Plaintiffs and the other members of the Class.

303.   This claim is brought within the applicable statute of limitations.

## XIII.  VIOLATIONS OF THE SECURITIES ACT

304.   Plaintiffs bring the claims in Count III and V under Sections 11 and 15 of the Securities Act, individually and on behalf of all persons and entities who purchased shares of Snap common stock pursuant and/or traceable to the materially false and misleading Registration Statement effective March 1, 2017 and were damaged thereby.

305.   Plaintiffs' non-fraud claims brought under the Securities Act are based on

the fact that the Registration Statement contained untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading. Specifically, the Registration Statement contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding: (1) Snap's user growth and engagement, by minimizing the known adverse impact that Instagram's clone Stories function was having on Snap's user growth and engagement; and (2) the restatement of Snap's 2015 daily user metrics by failing to disclose Pompliano's detailed, credible allegations regarding Defendants' allegedly knowing misrepresentation of Snap's user engagement metrics and severe internal controls deficiencies.

306. In addition, the Registration Statement omitted material facts that Snap was required to disclose under Item 303 regarding the known adverse trend of direct competition by Instagram following its introduction of a clone version of Snapchat's Stories on its platform.

307. The Registration Statement also failed to disclose information regarding material risks pursuant to Item 503, including: (i) the effect of Facebook's competing product, Instagram Stories, on Snap's DAU; and (ii) the existence and merits of Pompliano's complaint.

308. Finally, the Registration Statement failed to disclose information required to be disclosed under ASC 450 regarding Pompliano's complaint in its discussion of litigation-related risks facing the Company.

### 1.     The Defendants

309. As specified in Counts III-IV below, Plaintiffs' claims under the Securities Act are asserted against Defendants Snap, Spiegel, Murphy, and Vollero (collectively, the "Securities Act Defendants").

### C.     Factual Background

### 1.     Snap's IPO

310. On February 2, 2017, Snap filed a preliminary version of the registration

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

statement and prospectus with the SEC on Form S-1, and filed amendments thereto on Form S-1/A on February 2, 2017, February 9, 2017, February 16, 2017, and February 27, 2017, respectively. The Registration Statement was signed by Defendants Spiegel, Murphy, and Vollero, and was declared effective by the SEC on March 1, 2017.

311. On or about March 3, 2017, Snap completed its IPO, raising approximately $3.4 billion from investors by selling 200 million shares of Snap common stock at $17 per share. As set forth above, Snap and the underwriters offered, sold, and/or solicited sales of Snap common stock in the IPO.

## 2. The Securities Act Defendants Rushed to Bring Snap to Market In the Face of Rapidly Growing Competition from Facebook

312. Snap's IPO was hotly anticipated, in part due to a lull in major IPO filings in the year preceding Snap's IPO, and the fact that a major social media company had not had an IPO since Twitter in 2013. However, unlike Facebook and Twitter, Snap was still immature in terms of the monetization of its user base at the time it went public. As one of the early investors in Snap commented, the IPO "definitely happened faster than I thought" and that he was surprised that "they're going to go tap the public markets already."

313. Undisclosed to investors, Snap's eagerness to tap into public investors as a source of capital was due to the fact that six months prior to Snap's IPO, in August 2016, Facebook released its own version of Snapchat's wildly popular "Stories" feature on its Instagram platform, allowing users to share multiple photos and videos in a slideshow format. Bearing the identical name, Instagram's Stories was a virtual clone of Snapchat Stories and immediately resulted in a rapid increase in user growth and engagement on Instagram at the same time that Snap's user growth and engagement plummeted.

314. As would only be revealed after the IPO, Instagram's replication of Stories had an immediate and dramatic impact on Snapchat's user growth and engagement, as reflected in the following chart:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



315.   Former employees confirm that it was known within Snap that Instagram Stories was directly competitive with Snapchat and was responsible for Snap's decline user growth and engagement.  Moreover, the threat of competition by Instagram led Snap's customers to question the value of Snapchat as a platform for advertising, concerns which were directly communicated to Snap's senior management prior to the IPO.

316.   In the face of the known, material adverse trend posed by competition from Instagram, the underwriters conduced a hasty due diligence investigation as Snap rushed to go public before the extent of the impact of Instagram's Stories had on Snap's user growth and engagement.  For example, in an unprecedented move fueled by Snap's demands for secrecy, in jockeying with other banks to be part of the syndicate of underwriters, all banks but Morgan Stanley and Goldman Sachs dispensed with even receiving a draft of the IPO prospectus before it was filed.  As one prominent capital markets lawyer at Orrick Herrington & Sutcliffe LLP remarked at the time, "I cannot imagine any other deal in which banks would let something like this happen."

### 3.   The Securities Act Defendants Conceal Pompliano's Credible Allegation that Snap User Metrics were Unreliable

317.   Pompliano filed his initial complaint in California Superior Court on

January 4, 2017. The initial complaint was filed under seal, with only a heavily-redacted version available for the public. As was reported at the time, Snap immediately denied the allegations, stating that the complaint "has no merit" and was "totally made up by a disgruntled former employee."

318. Snap's public denials continued during the period before its IPO. On January 18, 2017, the Company moved to maintain Pompliano's California under seal, stating in a public filing that Pompliano's complaint was a "late-breaking bid" to air "sensationalist allegations" as Snap prepared for its IPO. Furthermore, Snap derided Pompliano's allegations, stating that his "allegations against Snap are false from top to bottom and right out of his allege-fraud-against-former-employers playbook."

319. Undisclosed to investors, one of Pompliano's core allegations, which was not publicly available at the time of the IPO, was that Snap had historically misstated its DAU numbers due to its reliance on third party measurement applications it knew to be false. The Registration Statement confirmed this fact, demonstrating the materiality of the omission of Pompliano's allegations in the Registration Statement.

### 4. The Underwriters Reap Enormous Profits in Snap's IPO

320. Based on the number of shares sold in the IPO, the underwriters along with the IPO's other underwriters, netted approximately over $80 million in commissions. In addition, the underwriters in Snap's IPO reserved up to 7.0% of Snap shares at the initial public offering price which they sold at handsome profits.

### 5. As Information Concealed in the Registration Statement Is Gradually Disclosed, the True Value of Snap Common Stock Is Revealed

321. The Registration Statement contained untrue statements of material fact, omissions of material fact which rendered the Securities Act Defendants' disclosures misleading, as well as material omissions in contravention of the Securities Act Defendants' affirmative disclosure obligations. As a result of these misstatements and omissions, the information disclosed in the Registration Statement did not accurately

reflect the risks associated with investments in Snap common stock, and therefore the initial offering price set by the Securities Act Defendants did not reflect the true value of Snap common stock.

322.  As the information concealed by the Securities Act Defendants' misstatements and omissions was gradually disclosed to the market, the disclosure of this new information revealed the true value of Snap common stock, causing the trading price of Snap common stock to decline, thereby damaging Plaintiffs and the Class.

323.   The following events, among others, revealed the relevant truth concealed by Defendants' misstatements and omissions:

   a.  On April 4, 2017, it was reported that Pompliano had moved to unseal the Pompliano California Complaint.  The report noted that according to newly-released details, "[c]urrently redacted portions of Pompliano's lawsuit contain user metrics that he claims are different from what Snap told investors and the press ahead of its February IPO."

   b.  On May 10, 2017, Snap announced disappointing user growth of only 5% quarter-over-quarter in the first quarter of 2017.  Market commentators attributed Snap's slowing user growth to direct competition from Instagram.  For example, a report by *VentureBeat* noted that "Snapchat added 5 million users in Q4 2016, and just a little more in Q1 2017 (8 million).  Compared to early 2016, this growth rate sucks, and the change correlates with the rise of Instagram Stories."

   c.  On June 7, 2017, it was reported that based on data from SensorTower, a firm that tracks app analytics, worldwide downloads of Snapchat for the months of April and May 2017 were down 22% from the year prior.  An analyst report issued on this date noted that "By comparison, Instagram downloads have demonstrated YoY growth, suggesting that competitive pressures may be intensifying for Snap, challenging the platform's ability to attract and retain new users."

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

d. On July 11, 2017, Morgan Stanley downgraded Snap's stock and lowered its price target by 42% to $16, below the IPO valuation. In support of its decision, Morgan Stanley cited the SensorTower download data, commenting that Morgan Stanley was "lowering [its] forward DAU estimates given this data," which it viewed as a "troubling directional trend[] which causes us to lower our DAU outlook."

e. On August 10, 2017, Snap reported DAU growth of only 4% quarter-over-quarter, a second consecutive quarter of disappointing user growth. Market commentary attributed Snap's disappointing DAU growth to competition from Facebook. For example, on August 10, 2017, Fortune reported that "Snap Inc. reported a lower-than-expected number of daily active users for Snapchat, its popular messaging app, for the second quarter as the company grapples with stiff competition from Facebook."

324. These events, among others, revealed to the market that the Registration Statement contained false statements and omissions of material fact about the Company's user growth and the impact of competition from Instagram, as well as the risk of real or perceived inaccuracies in the Company's user engagement metrics.

**D.    The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act**

**1.    Failure to Disclose the Impact of Instagram "Stories" on Snap's DAU**

325. The Registration Statement made clear that Snap's Daily Active User metric, or DAU, was "a critical component" to the Company's revenues and growth. According to the Registration Statement, Snap "assess[ed] the health of [its] business by measuring Daily Active Users" as its "ecosystem of users, advertisers, and partners depend[ed] on the engagement of [its] user base." Thus, if Snap failed to retain current users or add new users, or if its users engaged with Snapchat less often, its "business

would be seriously harmed."  Similarly, Snap admitted that if the Company was "unable to successfully grow [its] user base and further monetize [its] products, [its] business will suffer."

326.   Underscoring the importance of the Company's user engagement metrics, and DAU in particular, to potential investors, the Registration Statement contained myriad statements touting Snap's DAU and its historical growth rate.  For example, the Registration Statement represented that "[o]n average, 158 million people use Snapchat daily, and over 2.5 billion Snaps are created every day."  It further stated that the "158 million Daily Active Users on average in the quarter ended December 31, 2016," represented "*an increase of 48%* as compared to our Daily Active Users in the quarter ended December 31, 2015."

327.   While the Registration Statement disclosed that "[t]he rate of net additional Daily Active Users was relatively flat in the early part of the quarter ended December 31, 2016," it assured potential investors that that DAU growth had in fact *"accelerated in the month of December."*

328.   Explaining the "relatively flat" DAU growth in 4Q 2016, the Registration Statement noted that Snap *"historically experienced lumpiness in the growth of our Daily Active Users"* and that this particular issue "primarily related to accelerated growth in user engagement earlier in the year, diminished product performance, and increased competition."

329.   With respect to the "*increased user engagement*" to which the Registration Statement primarily attributed "lumpiness" in its growth, the Registration Statement explained that "[t]he rate of net additional Daily Active Users accelerated in the first half of 2016 compared to the second half of 2015, largely due to *increased user engagement* from product launches and increased adoption rates among older demographics."  This "*higher baseline of Daily Active Users* heading into the third and fourth quarters," the Registration Statement explained, made "*incremental net additions within these quarters [] more difficult even with strong year-over-year growth."*

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

330.   The Registration Statement minimized the impact of competition, vaguely stating that the Company saw "increased competition both domestically and internationally in 2016, as many of our competitors launched products with similar functionality to ours." However, the Registration Statement falsely assured investors that any impact on Snap's user growth and engagement caused by increased competition was a hypothetical risk rather than a concealed reality.

331.   For example, among potential "Risk Factors" that could "seriously harm[]" the Company, the Registration Statement represented that ***"[w]e anticipate that our Daily Active Users growth rate will decline over time if the size of our active user base increases or we achieve higher market penetration rates,"*** and noted that "[o]ur Daily Active Users may not continue to grow."

332.   Moreover, while disclosing the "risk" that "[o]ur business is highly competitive," the Registration Statement represented that "[i]f we are not able to maintain or improve our market share, our business ***could*** suffer." Likewise, with respect to Snap's DAU-based advertising revenue, the Registration Statement noted that "advertising revenue ***could be*** seriously harmed by" "competitive developments."

333.   Additionally, among "factors that could negatively affect user retention, growth, and engagement," the Registration Statement noted that "our competitors ***may*** mimic our products and therefore harm our user engagement and growth." The Registration Statement also noted that "[o]ur competitors ***may*** also develop products, features, or services that are similar to ours or that achieve greater market acceptance."

334.   The only disclosure made in the Registration Statement with respect to Instagram Stories was the following:

> Instagram. a subsidiary of Facebook. recently introduced a 'stories' feature that largely mimics our Stories feature and may be directly competitive.

335.   The statements in ¶¶325-34 were materially false and misleading because, rather than its DAU growth "accelerating" or being hindered by historical "lumpiness" or a "higher baseline," Snap's DAU growth rate had been significantly diminished by

Facebook's launch of Instagram "Stories."

336.   For example, FE 1 revealed that from the second and third quarters of 2016 until the time FE 1 left Snap in the first quarter of 2017, there was an ongoing concern within Snap regarding Instagram and its effect on Snap's ability to compete for advertisers.  FE 1 described how sales teams were nervous because Instagram came up in conversations with Snap's major advertising clients and the concern about Instagram was always in the background in such conversations.  FE 1 stated that it was known internally at Snap that Facebook was spending a lot of money on Instagram in order to compete with Snapchat.  FE 1 revealed that after Instagram launched its Stories function, concerns about Instagram and Snap's ability to compete specifically came up in the sales team's conversations with advertisers.

337.   FE 1 stated that in light of Instagram's release of Stories, Snap's pitch to advertisers centered on Snapchat's authenticity.  FE 1 added that advertisers were told that Snapchat was on an upward trajectory and the advertisers wouldn't want to miss the chance to get in on it.  FE 1 noted that these claims were often met with skepticism.

338.   FE 1 explained that the sales team's concerns were relayed to Snap's executive management.  FE 1 stated that sales personnel told Snap's executive management that Snap had to respond to Instagram's Stories launch and asked what they should say to advertisers.  In response, Snap released a statement internally to the Company's employees responding to this concern.  FE 1 stated that this statement by executive management simply touted Snap's ability to innovate and minimized the risk of competition.

339.   FE 2 described a January 2017 company-wide meeting held in an airplane hangar in Santa Monica, which FE 2 characterized as an attempt to host an Apple-style town hall for all employees.  At the company-wide meeting, Spiegel held a Q&A session in which he fielded numerous questions from Snap employees concerned about the Company's ability to compete with Facebook's Instagram and the negative sentiment about Snapchat expressed to sales staff from advertisers.   FE 2 recalled that these

concerns were met with a dismissive attitude and a vague call to execute on the Company's strategy and not worry about Facebook.  Spiegel's views were later summarized in a company-wide memo from Spiegel that sought to rebut the concerns expressed by employees about the impact of competition from Facebook.

340.  FE 2 revealed that in contrast to management's dismissive attitude, Snap sales personnel were left to convince skeptical advertisers of the value of investing in Snap's platform, whose effectiveness was unproven, instead of Facebook or Instagram, with which advertisers were familiar and more confident in their return on investment. FE 2 revealed that in light of the consistent concerns expressed by Snap's advertising customers about the value of Snap's platform, Snap's internal sales projections and assumptions about their ability to grow and monetize their platform were unreasonable. For example, FE 2 revealed that sales teams in different regions, including Dallas, New York, and Chicago were unable to meet the Company's sales targets, which assumed continued exponential growth.

341.  These accounts are corroborated by new reports published after the IPO, which revealed that internally at Snap there was widespread anxiety over Snap's inability to compete with Facebook.  For example, as recounted in a *Business Insider* profile of Spiegel published months after the IPO in August 2017:

> Around the time of Snap's initial public offering in early March, employees got a rare chance to ask the CEO, Evan Spiegel, anything on their minds.

> Unlike the "town hall" meetings at Google, Facebook, and other tech companies, the Q&A at Snap was a written affair. Using a shared document, employees submitted questions to the company's 27-year-old leader.

> The result revealed a common anxiety: About one dozen of the questions were a variation of whether employees should worry about Snapchat's competitors, particularly Facebook and Instagram, which appeared to be crimping Snapchat's rapid growth.

342.  Consistent with the accounts of former Snap employees, the report revealed that Spiegel minimized the risk of competition from Instagram, dismissing the concerns of his employees:

> Spiegel's responses were short, and the one-word answer "no" was all that was written next to some of the queries, according to multiple people with

knowledge of the document. Other answers of Spiegel's explained how employees should not think about the competition and should instead focus on delivering the best products and on innovating.

343.   Indeed, immediately upon Instagram's launch of its "Stories" feature, Snap observed an immediate drop in new downloads of its application.  By the time of the offering, Instagram's Stories feature had as many daily active users as Snap.   The following graph illustrates this trend:



344.   Thus, rather than the hypothetical possibility of competition by Instagram to which the Registration Statement vaguely referred, Facebook had in fact "develop[ed] products, features, or services" specifically designed to mimic Snap's features and directly compete with Snap.  Moreover, Instagram's rapid growth in its DAU in a matter of a few months to reach the number of users Snap had achieved in two years represented an existential threat to Snap.

345.   Despite this known trend, the statements in the Registration Statement created a materially false impression that the Company's DAU would continue to grow even in the face of serious competition that was then-affecting the Company.

### 2.   Failure to Disclose the Fact of and Nature of Allegations in the Pompliano Complaint

346.   The Registration Statement emphasized the importance of lawsuits to the

Company by disclosing to potential investors that "[f]rom time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming.  If resolved adversely, lawsuits and other litigation matters could seriously harm our business."  In particular, the Registration Statement explained:

> *Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and accordingly our business could be seriously harmed. Although the results of lawsuits and claims cannot be predicted with certainty, we do not believe that the final outcome of those matters that we currently face will seriously harm our business.*

347.   Highlighting the significance of lawsuits to the Company, the Registration Statement specifically disclosed in a section of the Registration Statement titled, "Pending Matters," two lawsuits.  The first disclosed lawsuit was brought in September 2015 and involved a claim that the defendants improperly used the plaintiff's image.  The second was a personal injury lawsuit filed in April 2016 which had been dismissed.  Yet, the Registration Statement failed to disclose the existence and substance of Pompliano's claims against the Company—which, at the time of the IPO, had been filed under seal, with material information redacted from public view.

348.   As set forth above, Pompliano's complaint revealed a systemic failure in Snapchat's internal controls and computation of critical user metrics, and alleged that these problems persisted until the IPO.  More specifically, Pompliano claimed that Snap's user data was unreliable and inaccurate, and that Snap had misled advertisers and investors.

349.   Indeed, without disclosing the merits of Pompliano's complaint, the Registration Statement attempted to clarify Snap's historical data analytics by stating:

> In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate. . . . Additionally, to align our pre-June 2015 Daily Active Users with this new methodology, we reduced our pre-June 2015 Daily Active Users by 4.8%, the amount by which we estimated the data generated by the third party was overstated.  Since this adjustment is an estimate, the actual pre-June 2015 Daily Active Users may be higher or lower than our reported numbers. As a result, our metrics may not be comparable to prior periods.

350.   The reliability of Snap's third party analytics and the adjustment that Snap asserted that it had made to the 2015 Daily Active User metrics were precisely the facts that Pompliano asserted that he had identified and raised with Snap's senior managers in 2015 and had been fired in retaliation as a result of raising those very concerns, among others, about Snap's user metrics.  A reasonable investor would have wanted to know that (i) such allegations had been made; and (ii) the very employee that had brought these issues to Snap's attention was alleging that he had been fired in retaliation therefor.

351.   The Registration Statement's failure to disclose the existence and substance of Pompliano's allegations and the ongoing controversy surrounding the reliability of Snap's user metrics rendered many of its statements materially misleading.  For instance, Pompliano's allegations raised "perceived" if not "real" concerns about the accuracy of Snap's user metrics, which, according to the Registration Statement, posed a serious harm to the Company.  Snap's failure to disclose Pompliano's allegations rendered Snap's disclosures of historical user data incomplete and misleading.

**E.    The Registration Statement Failed to Disclose Information Required to Be Disclosed under SEC Regulations**

**1.    Item 503**

352.   Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information required by Item 503 of Regulation S-K, which requires the registrant to disclose, among other things, a "discussion of the ***most significant factors that make the offering speculative or risky.***"  17 C.F.R. § 229.503(c).  Item 503 also required that Defendants "[e]xplain how the risk affects the issuer or the securities being offered."  However, the Registration Statement failed to disclose information regarding material risks pursuant to Item 503.  The disclosures in the Registration Statement therefore failed to adequately alert investors to the actual risks associated with an investment in Snap.

353.   As set forth in ¶¶325-51, the Registration Statement omitted material information regarding: (i) the effect of Facebook's competing product, Instagram Stories,

on Snap's user growth and engagement; and (ii) the existence and merits of Pompliano's complaint. These omissions constituted "significant factors" that made the IPO "risky or speculative," as demonstrated by the Registration Statement's disclosures regarding material risks that could pose serious threats to the Company, including risk that if Snap failed to add new users, or if its users engaged less, its "business would be seriously harmed" and that "*real or perceived inaccuracies* in those metrics may seriously harm and negatively affect our reputation and our business."

354. As a result, the Securities Act Defendants had a duty to disclose these currently-known, adverse factors that made the IPO risky. Defendants failed to disclose the nature and magnitude of Snap's risk from competition by Instagram, and gave no meaningful indications of the Company's real vulnerability to perceived inaccuracies in its user engagement metrics. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants violated Item 503.

### 2. Item 303

355. Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

356. In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

357.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

358.    The Registration Statement failed to disclose material information regarding known trends and uncertainties pursuant to Item 303.  As alleged herein, the Registration Statement failed to disclose that Facebook had launched a clone version of one of Snap's key products—Snapchat Stories—which was causing a materially unfavorable impact on Snap's user growth and engagement and, consequently, its ability to monetize its platform.

359.    As set forth in ¶¶325-51, the Registration Statement omitted material information regarding: (i) the effect of Facebook's competing product, Instagram Stories, on Snap's user growth and engagement; and (ii) the existence and merits of Pompliano's complaint.

360.    As Snap disclosed in the Registration Statement, Snap's DAU was "a critical component" to the Company's revenues and growth.  According to the Registration Statement, Snap "assess[ed] the health of [its] business by measuring Daily Active Users" as its "ecosystem of users, advertisers, and partners depend[ed] on the engagement of [its] user base."  Thus, if Snap failed to retain current users or add new users, or if its users engaged less, its "business would be seriously harmed."  As a result, the Securities Act Defendants had a duty to disclose in the Registration Statement the known, adverse trend posed by competition from Instagram's Stories.

361.    The Registration Statement disclosed that ***"real or perceived inaccuracies***

in [the Company's user] metrics may seriously harm and negatively affect our reputation and our business." Therefore, the Securities Act Defendants had a duty to disclose the known uncertainty posed by Pompliano's allegations that the Company's user engagement metric were unreliable, particularly in light of the fact that the Registration Statement confirmed one of Pompliano's core allegations: Snap had been forced to restate its historical DAU numbers due to its reliance on third party measurement applications it knew to be false.

362. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants failed to comply with Item 303.

### 3.   ASC 450

363. The Securities Act Defendants had a duty to disclose Pompliano's action and the nature of his claims under ASC 450. ASC 450 governs the disclosure and accrual of contingencies by public companies in their periodic reports and registration statements filed with the SEC. If the likelihood of a material loss is "reasonably possible," i.e., more likely than remote, but less likely than probable, and the amount of the reasonably possible loss is estimable, then a company must disclose the nature of the contingency and also provide its estimate of the amount or range of loss. If the reasonably possible loss is not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

364. Under ASC 450, the Securities Act Defendants' failure to disclose Pompliano's complaint in its discussion of litigation-related risks facing the Company was a material omission. Given that, according to the Registration Statement, ***"real or perceived inaccuracies*** in [Snap's user] metrics may seriously harm and negatively affect our reputation and our business," Pompliano's allegations posed a risk of material loss that was at least reasonably probable, regardless of whether Snap disputed Pompliano's claims.

365. Moreover, California Labor Code § 1054, pursuant to which Pompliano brought his initial complaint, provides for treble damages. In addition to such damages,

Pompliano sought punitive damages for his alleged wrongful termination.  Given that at the time of IPO, Snap was losing money, the likelihood of a material loss as a result of his complaint was "reasonably possible."   Therefore, the Securities Act Defendants violated ASC 450 by failing to disclose the fact of Pompliano's complaint.

## XIV.   CAUSES OF ACTION UNDER THE SECURITIES ACT

### A.   COUNT III: For Violation of §11 of the Securities Act against the Securities Act Defendants

366.   Plaintiffs incorporate ¶¶304-65 by reference.  Allegations contained in ¶¶1-22 and 41-303 are expressly not part of this claim.  This claim is premised on the remedies available under Section 11 of the Securities Act, and does not assert that the Securities Act Defendants acted with fraudulent intent.

367.   The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and/or omitted facts required to be stated therein.

368.   Defendants Spiegel, Murphy, and Vollero each signed the Registration Statement and caused it to be declared effective by the SEC on or about March 1, 2017.

369.   Snap is the registrant for the IPO and as issuer of the shares is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

370.   Each of the Securities Act Defendants named herein is responsible for and are liable for the contents and dissemination of the Registration Statement.

371.   As a result of their roles with Snap, and their contacts and communications, Defendants Spiegel, Murphy, and Vollero should have known of the untrue and misleading statements of material fact contained in the Registration Statement.

372.   The Securities Act Defendants caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of 200 million Snap shares, which shares were purchased by Plaintiffs and the Class.

373.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

Registration Statement were true and did not omit any material facts required to be stated therein or facts that were necessary to make the statements made therein not false or misleading.

374.   By reason of the conduct herein alleged, each defendant named in this Count violated §11 of the Securities Act.

375.   Plaintiffs acquired Snap common stock pursuant and/or traceable to the Registration Statement.

376.   Plaintiffs and the Class have sustained damages as a result of the Securities Act violations alleged herein.

377.   At the time of Plaintiffs' purchases of Snap common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

378.   Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that the original complaint and this complaint were filed.

**B.      COUNT IV: For Violation of §15 of the Securities Act against the Executive Defendants**

379.   Plaintiffs incorporate ¶¶304-65 by reference.  Allegations contained in ¶¶1-22 and 41-303 are expressly not part of this claim.  This claim is premised on the remedies available under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

380.   This Count is brought pursuant to §15 of the Securities Act against the Executive Defendants.

381.   The Executive Defendants each were a control person of Snap by virtue of his or her position as an owner, director, and/or senior officer of Snap.

382.   The Executive Defendants oversaw all operations and financial controls at

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

Snap and Snap could not have completed the IPO without these Defendants signing or authorizing their signatures on the Registration Statement.

383.   Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that the original complaint and this complaint were filed.

## XV.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

384.   Plaintiffs bring this action as a class action on behalf of all those who purchased Snap common stock during the Class Period, including those who purchased Snap common stock pursuant and/or traceable to the Registration Statement (collectively, the "Class").  Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

385.   The members of the Class are so numerous that joinder of all members is impracticable.  Snap stock is actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class because over 381 million shares were outstanding as of May 15, 2016.  Record owners and other members of the Class may be identified from records maintained by Snap or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

386.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

387.   Plaintiffs will fairly and adequately protect the interests of the members of

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

the Class and have retained counsel competent and experienced in class and securities litigation.

388.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.   whether Defendants violated the 1933 Act and/or 1934 Act and Rule 10b-5 promulgated thereunder;

      b.   whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

      c.   whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

      d.   whether Defendants made false or misleading statements of material fact during the Class Period;

      e.   whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading during the Class Period;

      f.   whether the price of Snap stock was artificially inflated;

      g.   whether the market for Snap common stock was efficient; and

      h.   the extent of damage sustained by Class members and the appropriate measure of damages.

389.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XVI.  PRAYER FOR RELIEF

390.   WHEREFORE, Plaintiffs pray for relief and judgment as follows:

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS

a. Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs' counsel as Class Counsel;

b. Declaring that Defendants are liable pursuant to the Securities Act and/or Exchange Act;

c. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

d. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' costs and expenses incurred in this action; and

e. Awarding such other relief as the Court may deem just and proper.

## XVII. JURY DEMAND

391.   Plaintiffs demand a trial by jury.

DATED: November 13, 2018                    Respectfully submitted,


**LEVI & KORSINSKY, LLP**

/s/ *Adam M. Apton*
Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel:  (213) 985-7290

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
E-mail:  jpafiti@pomlaw.com
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499

**POMERANTZ LLP**
Jeremy A. Lieberman
Email:  jalieberman@pomlaw.com
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiffs Sharmilli Ghosh, Irland James Stewart, and Howard Weisman*

CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS